In the Matter of BIOLINE LABORATO-RIES, INC., Alleged Debtor.

Bankruptcy No. 180–00235.

United States Bankruptcy Court, E. D. New York.

April 7, 1981.

Skydell, Sigall, Rosen & Windheim, P.C., New York City, for alleged debtor by Samuel K. Rosen, New York City, of counsel.

Kenneth Sawyer and Brenner, Saltzman & Wallman, P.C., New Haven, Conn., for Hollywood OBL Corp. by Marc A. Wallman, New Haven, Conn., of counsel.

Ruben,Schwartz, Lasker & Schnall, New York City, for petitioning creditors by Seymour J. Silberberg, New York City, of counsel.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Trefoil Factors Corp. by Conrad B. Duberstein, New York City, of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This decision encompasses a series of motions generated initially by the filing of an involuntary Chapter 11 petition pursuant to Section 303 of the Bankruptcy Reform Act of 1978 ("THE CODE"), 11 U.S.C. § 303, against the alleged debtor Bioline Laboratories, Inc. ("BIOLINE"), a New York corporation with offices in the Borough of Brooklyn, on January 18, 1980. The following is a resumé of the procedural history and facts of the case as adduced from the various hearings, motions, affidavits, briefs and exhibits which have come before me in this lengthy matter.

Prior to the filing of the involuntary petition for relief herein, Bioline had been engaged in the business of the wholesale distribution of pharmaceutical drugs and sundries. It encountered financial difficulties which made it impossible for it to continue the operation of its business and it arranged for a bulk transfer, *inter alia*, of most of its inventory, machinery, equipment and accounts receivable to Hollywood OBL, Inc., a Florida corporation ("HOLLYWOOD"). A contract entitled "Asset Purchase Agreement" was executed on December 20, 1979 among Bioline, Jerome Phillips ("PHILLIPS") its president and the owner of over 80% of its shares of stock, and Hollywood (The agreement is attached as Exhibit A to Bioline's Order to Show Cause filed on July 31, 1980). The basic terms of the sale are as follows: Hollywood agreed to purchase virtually all of Bioline's inventory, equipment and machinery. It also agreed to purchase, *inter alia*, its accounts receivable arising in the ordinary course of business, certain leases, goodwill, customer lists, trademarks and trade names, computer software and business records. It was agreed that Hollywood was not purchasing cash on hand, life insurance policies owned on officers of Bioline, accounts receivable due from officers or employees or claims for Federal or State tax refunds. The intention of the parties was that Hollywood would take over the business of Bioline (Asset Purchase Agreement, ¶ 1).

Regarding the price of the items purchased, Hollywood agreed to pay Bioline's cost for its inventory, 90% of the face amount of its accounts receivable not outstanding for more than 90 days and 10% for others except those already transferred to collection agencies (Asset Purchase Agreement, ¶ 2). It also agreed to assume and discharge Bioline's liability to Trefoil Capital Corp. ("TREFOIL"), a secured creditor which held a lien on all of its assets except good will [Transcript ("TR.") January 21, 1980, p. 4, 1. 24—p. 5, 1. 4], and to assume telephone, utility, tax and payroll liabilities (Asset Purchase Agreement, ¶ 3).

The parties agreed to retain the accounting firm of Deloitte, Haskins and Sells ("DELOITTE") to conduct a physical inventory of Bioline's assets, review its books and records, and prepare a report fixing the dollar amount to be paid under the terms of the Asset Purchase Agreement (*Id.,* ¶ 4). Upon determination of the total purchase price by Deloitte, the amount in excess of the amounts to be paid to Trefoil, telephone, utilities, payroll, taxes and certain other items, was to be paid by delivery to Bioline of "Purchase Obligation Notes" to be paid as follows: 4% of the face amount on June 30, 1980, and 3% a month until November, 1982, when the balance of the notes would be due and payable (*Id.,* ¶ 3.5). The import of this provision is that unsecured creditors, primarily trade creditors, would not be paid in full, immediately, but rather would be paid some percentage of their claims, depending upon the amounts arrived at by Deloitte, over a period of time. Finally, the parties agreed to comply with all applicable laws regulating bulk sales (*Id.,* ¶ 7.3).

A notice of bulk transfer, dated January 3, 1980, was timely sent to Bioline's creditors (Exhibit C to petitioning creditors' motion for summary judgment, filed July 9, 1980). The closing was scheduled to take place on January 22, 1980, at 10:00 a. m.

The involuntary Chapter 11 petition was filed, on January 18, 1980, by three of Bioline's general trade creditors holding claims aggregating approximately $170,000. The petitioning creditors also submitted an Order to Show Cause to me on the same day seeking to restrain Bioline, pending a determination of whether relief should be ordered pursuant to the involuntary petition, from completing the bulk sale of its assets to Hollywood, and temporarily restraining it from any transfers out of the ordinary course of its business until the hearing on the Order to Show Cause, which I scheduled for January 22 at 2 p. m.

On the morning of January 21, 1980, counsel for Bioline telephoned me to request that the hearing on this matter, set for January 22 at 2 p. m., be moved up to the afternoon of January 21 at 4 p. m.

During that conversation, I inquired of counsel as to what percentage payment unsecured creditors could expect under the Asset Purchase Agreement and whether that payment would be at least 50%. Counsel informed me that it would and I granted his request on condition that all sides consent thereto. At the hearing that afternoon the vice-president of Hollywood, one Kenneth Sawyer ("SAWYER"), submitted an affidavit in which he estimated that pursuant to the Asset Purchase Agreement approximately $700,000 would be available to satisfy the total unsecured indebtedness of approximately $1,100,000, and guaranteed on Hollywood's behalf, that regardless of the final figure arrived at pursuant to the Agreement, unsecured creditors would receive no less than 50 cents for each dollar of claim (Bioline's Exhibit A).

By the date of the hearing, it appeared that Bioline's financial situation had become critical. It had no funds with which to pay its employees their wages which were due on the Friday before the hearing and Trefoil, which had been making advances against its accounts receivable, had cut off its financing. There is no dispute that the company was thus effectively out of business (See Tr. January 21, 1980, p. 19, 1. 3—p. 21, 1. 6).

At the hearing, the petitioning creditors contended that for several months Bioline had difficulty meeting its debts, that the bulk sale had been arranged without consulting them; that the bulk sale notice was ambiguous as to how much money the general creditors would receive, if any, and that they knew nothing of the financial reliability of Hollywood (Tr. January 21, 1980, p. 5, 1. 5, p. 6, 1. 10). They further contended that another company, Darby Drug Co., Inc. ("DARBY"), was willing to purchase the same assets for the same amount but would complete payments before the end of November, 1980 (Id., p. 6, 1. 11—p. 8, 1. 22). Petitioning Creditors' Exhibit 1 is the affidavit of Joseph Ashkin ("ASHKIN"), the president of Darby, submitted in support of the petitioning creditors' application for an order restraining the bulk sale. Ashkin alleged therein that although he had expressed interest in purchasing the assets of Bioline to Phillips several months before the bulk sale, that he had been put off by Phillips, and that he was willing to make an offer for the same assets being purchased by Hollywood at the same price but would pay half the purchase price at closing and the balance on November 1, 1980.

The petitioning creditors thus sought to have the bulk sale enjoined and Chapter 11 relief ordered against Bioline so that its assets might be appraised under court supervision and to permit the various parties to bid on the business. They felt compelled to move for the temporary order restraining the bulk sale because if the bulk sale went through before I could hear the matter, in the words of counsel for the petitioning creditors, "the court would have been dealing with an estate which was no longer an estate. There would be a shell only. It would have precipitated a meaningless proceeding. . . ." (Id., p. 9, 1. 8—p. 12, 1. 6.)

Bioline, on the other hand, contended that it was effectively out of business; that it was unable to pay its approximately 60 employees and, without financing, had survived since the issuance of the bulk sale notice only by reason of the fact Hollywood had been reassuring creditors that it would take over and revive the company and that the general unsecured creditors could expect between 50 and 60 cents for each dollar of their claims, (Id., p. 19, 1. 22—p. 21, 1. 6; p. 51, 1. 20—p. 52, 1. 5). It also contended that a large majority of the general creditors, including Zenith Laboratories to whom it owed approximately $150,000, Pharmadyne Corporation, to whom it owed approximately $160,000, and Premo Pharmaceutical Co., to whom it owed approximately $170,000, supported the bulk sale and had no interest in a Chapter proceeding. It pointed out that Zenith and Pharmadyne, at least, doubted the validity of Ashkin's proposed offer (Id., p. 25, 1. 7—p. 33, 1. 23; p. 41, 1. 18—p. 42, 1. 6; p. 50, 1. 24—p. 51, 1. 9). It also contended that Darby, Bioline and Hollywood were all competitors; that Darby was located in Rockville Centre, New

York, in close proximity to Bioline; that Ashkin had precipitated the filing of the involuntary petition in order to prevent the bulk sale from being consummated so that Bioline's business would be liquidated and thus lessening his competition. It argued that Ashkin had no intention of making an offer for Bioline's assets and, indeed, had six months earlier successfully prevented Hollywood from acquiring the assets of another pharmaceutical company by promising to offer a higher price which subsequently resulted in his refusal to make any offer whatsoever (*Id.*, p. 27, 1. 11—p. 32, 1. 9).

Trefoil, which appeared at the hearing, noted that it had no intention of providing any further financing for Bioline and, indeed, had prepared a summons and complaint to lift the automatic stay so that it might proceed to obtain possession of the property which was subject to its lien together with an order shortening the debtor's time to answer, if in fact relief was ordered. It suggested that the court should abstain from the case under Section 305 of the Code for two basic reasons: 1) because a fair and viable settlement of all matters had already been effected out of court, and 2) because this was a matter that properly should have been brought in the New York State courts under Article Six of Uniform Commercial Code as adopted in New York governing bulk sales (*Id.*, p. 33, 1. 24—p. 47, 1. 22).

At the close of the hearing, I rendered the following decision:

"This is what I propose to do. I will continue the stay of this sale if a bond of $500,000 is posted to indemnify this estate against any damages caused by reason of the delay in implementing the bulk sale which is scheduled to proceed tomorrow morning.

"I direct that the bond be filed no later than 12:00 o'clock noon tomorrow.

"In the event that the bond is not filed, either by the petitioning creditors or by Darby or Mr. Ashkin or anyone else who wishes to post such a bond, then the stay will be vacated.

"If the bond is filed, then there will be some time given to conduct a hearing to hear from other interested parties."
(*Id.*, p. 56, 11. 4–18).

No bond was filed, however, and on the afternoon of January 22, I signed an order vacating the petitioning creditors' Order to Show Cause dated January 18, 1980 and dissolving the temporary restraining order contained therein. Bioline and Hollywood subsequently consummated the bulk sale provided for in the Asset Purchase Agreement. Pursuant to that agreement, Hollywood changed its corporate name to Bioline Laboratories, Inc., apparently paid the unpaid wages thus retaining the employees and paid approximately $600,000 to Trefoil in order to satisfy its lien on the assets acquired. Although Hollywood is now doing business as Bioline Laboratories, Inc. and Bioline has changed its corporate name to Jerphil Enterprises, Inc. (*See*, Exhibit B accompanying Bioline's Order to Show Cause, filed July 31, 1980), I shall continue to refer to these entities as "Hollywood" and "Bioline" respectively.

On February 7, 1980, Bioline interposed an answer to the involuntary Chapter 11 petition in which it basically denied its allegations.

On May 20, 1980, Deloitte, pursuant to the Asset Purchase Agreement, prepared an interim calculation of the purchase price of Bioline's assets (Exhibit D of the Petitioning Creditors' motion for summary judgment, dated July 7, 1980). These figures are complete except for insignificant details and all parties have relied upon them for the purpose of this litigation. The report valued the assets acquired at $1,422,648. Pursuant to the agreement, Hollywood paid or assumed liabilities totaling $765,871, including $598,229 due to Trefoil. Subtracting these two figures, the amount of the notes due Bioline for the benefit of unsecured creditors was thus $656,777. In accordance with the Asset Purchase Agreement, the first installment on that sum was remitted by Hollywood to Samuel K. Rosen ("ROSEN"), who had been designated as the escrow agent for the collection and dis-

tribution of these funds and who was a member of the law firm representing Bioline. The amount of this first installment was $21,451.20 (Application of Rosen accompanying Bioline's Order to Show Cause filed July 31, 1980). On July 3, Rosen wrote to Counsel for the petitioning creditors informing him that he had received these funds and advising him that he would refrain from distributing them due to the existence of the proceeding before me (*Id.*, Exhibit B).

On July 9, 1980, the petitioning creditors moved this court for summary judgment on their involuntary Chapter 11 petition against Bioline, alleging that pursuant to Section 303(h)(1) of the Code, it was undisputed and admitted that Bioline had not been paying its debts as they became due, which fact alone entitled the movants to the relief sought. This fact is indeed undisputed.

On July 31, 1980, Bioline filed an Order to Show Cause why Rosen, as escrow agent, should not be permitted to distribute the funds received from Hollywood to the unsecured creditors pursuant to the Asset Purchase Agreement. By this time the second installment had been received from Hollywood.

The petitioning creditors, in an affidavit by counsel, dated August 7, 1980, opposed the Order to Show Cause on the basis that it was premature, due to the pendency of the involuntary petition. They further stated ,that if an order for relief was entered against Bioline pursuant to the involuntary petition, a motion or motions would follow seeking to shorten the time from 120 days to 30 days for creditors to be entitled to file a plan of reorganization and seeking to set aside the bulk sale as a fraudulent transfer pursuant to Section 548 of the Code. The motion for summary judgment was heard on August 7, 1980. Because all of the arguments made then were iterated at a subsequent hearing and in subsequent papers which were submitted, I shall move on to a discussion of those events.

On October 3, 1980, the petitioning creditors made a motion to set aside the bulk sale of Bioline's assets to Hollywood as being a fraud upon creditors under Section 548 of the Code. It was accompanied by a memorandum of law in which they contend (1) that technical grounds exist for ordering relief against the debtor since there is no dispute as to its inability to pay its debts; (2) that the definition of "value" found in Section 548(d)(2)(A) of the Code does not permit payments over time for the purpose of satisfying Section 548(a)(2)(A)'s requirement that an insolvent debtor receive not "less than a reasonably equivalent value" and (3) that, under Section 548(c), if Hollywood is found to have taken the assets in good faith and for value, the transfer could nonetheless be set aside but with Hollywood retaining a lien on the reconveyed assets.

Affidavits in opposition to this motion were filed on November 28, 1980 by Marc A. Wallman ("WALLMAN"), counsel for Hollywood and Sawyer, its vice president. These affidavits allege that the consideration paid for Bioline's assets is approximately $200,000 in excess of their book value, and thus "fair" under any legal standard; that over half of the purchase price will be paid off prior to the end of 1980; that it has already satisfied Trefoil's claim with a payment to it of $598,229; that it has already paid $10,000 in telephone and utility bills, $70,000 to Rosen as escrow agent, and has assumed responsibility for the settlement of a claim by the Drug Enforcement Agency of $15,000; that in light of such payments and in light of the fact that Hollywood is now doing business with many of Bioline's creditors—none of which have expressed displeasure with it—Hollywood's financial viability can no longer seriously be questioned; that its good faith has been amply demonstrated by its compliance with applicable laws regulating bulk sales and by its subsequent conduct, and finally, that it has invested substantial sums of money in order to revive Bioline into a viable company.

Albert Togut, Esq. ("TOGUT"), appearing of counsel to the law firm of Marcus and Angel, Esqs., either representing, or speaking in behalf of, certain other credi-

tors, also submitted an affidavit in opposition to the petitioning creditors' motion. He alleges that he represents National Pharmaceutical Manufacturing Co., which has a claim of approximately $75,328, Pharmadyne Industries with a claim of approximately $240,000 and M.D. Pharmaceutical, Inc., with a claim of $18,835; that he also speaks on behalf of other creditors with claims aggregating $350,000 and that, in sum, he speaks for nearly $700,000 worth of the total unsecured indebtedness of approximately $1.1 million all of whom oppose the various motions made by the petitioning creditors. He points out that Hollywood has obligated itself to satisfy priority tax claims against Bioline of approximately $62,825; that Rosen has the sum of $104,078.65 on hand awaiting distribution to unsecured creditors; that Darby's proposed offer is substantially similar to the one made by Hollywood and that Hollywood, having freed the assets from Trefoil's lien and having made the company viable, has proven its financial stability. He argues that if it should, at some time in the future, default on any payments, creditors would then have the right to seek any appropriate relief against it, including an involuntary petition in bankruptcy. A memorandum of law, also filed on December 15, 1980 accompanied Togut's affidavit.

The petitioning creditors filed a reply to the Sawyer, Wallman and Togut affidavits and the Togut brief on December 18, 1980. The petitioning creditors' motion to set aside the bulk sale as a fraudulent conveyance was heard by me on January 9, 1981. The arguments made by the parties in their various papers submitted in connection with this motion were iterated at the hearing. The petitioning creditors also raised the argument that a comparison of an unaudited balance sheet of Bioline, dated August 31, 1979 and attached as Exhibit 3 to its motion, with the actual figures arrived at by Deloitte in its report of May 20, 1980, reveals a "write-down" or "write-off" of $545,000 in the value of Bioline's assets. Both sides of this argument were developed further in letters submitted by the attorneys for the petitioning creditors and by Wallman after the hearing. In a letter dated January 23, 1981, the petitioning creditors argue that, without considering the loan receivable owed to Bioline by Phillips, its president and principal stockholder in the sum of $281,213, which was not purchased by Hollywood, there still remained a difference of $265,000 between the $1,687,204 worth of assets reported in the August 31, 1979 balance sheet and the $1,422,648 worth of assets in Deloitte's May 20, 1980 report. They further note that the value of the inventory is $162,000 less in the Deloitte report; that "Data Processing Equipment" valued on the balance sheet at $118,906 is not included in the Deloitte report; that accounts receivable were $8,422 lower in the Deloitte report and that realty and equipment show a reduction of $17,000. They finally point out that an income tax refund of $59,487 and the Phillips receivable, assets not purchased by Hollywood, have "been forever abandoned and rendered outside the reach of creditors...."

Wallman, in his letter to me dated February 4, 1981, notes that his client merely purchased the assets described in the Asset Purchase Agreement as valued by Deloitte at the time of closing. "At such time, there was significantly less inventory on hand than the amount shown on the debtor's unaudited August 31 balance sheet. This was not to be unexpected from a company ... obviously losing money." Furthermore, the values listed for accounts receivable are equivalent, and the "Data Processing Equipment" was not owned by Bioline. Rather, the figure on the balance sheet attributed to it represented capitalized lease payments. "Although such leases were of doubtful value, the purchase price determined by the Asset Purchase Agreement provided for a payment to the debtor equal to the amount of security deposits or advanced rentals on this equipment, plus $20,000." Finally, regarding the $57,487 income tax refund, Wallman notes that Bioline "owes the Internal Revenue Service over $100,000.00 on the basis of a tax audit of its 1976 and 1977 returns just completed."

Section 305 of the Code, entitled "Abstention", provides that:

"(a) The court, after notice and hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

"(1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . ."

For the following reasons, I have decided to dismiss this case pursuant to Section 305. First and foremost, I believe that the interests of creditors would best be served by such a dismissal. A majority of Bioline's creditors, over 60% in amount, oppose the various motions made by the petitioning creditors; in my opinion, for good reason. It was apparent to me on January 21, 1980, when I heard argument on the petitioning creditors' motion to restrain the bulk sale, that Bioline was virtually out of business. It was unable to meet its payroll, was low on inventory and without the financing essential to its survival. All parties at the hearing seemed to agree that there were only two serious possibilities under consideration: either the bulk sale to Hollywood would be carried out, or Darby would make a better offer and thereby acquire the assets. The thrust of the petitioning creditors' argument was that the bulk sale should be restrained so that Darby would have an opportunity to make its supposedly better offer. Bioline and Hollywood opposed this on the basis that they doubted Darby's good faith and believed that it was proposing this offer, which would never actually be made, in order to force Bioline to liquidate rather than be revitalized as a viable competitor.

I examined the bona fides of all sides, and, after considering all the arguments, devised a solution which I believe fairly accommodated all the competing interests. I enjoined the bulk sale on condition that the petitioning creditors or Darby post a $500,000 bond to indemnify Bioline from any damage suffered by reason of my delaying the bulk sale. Again, all parties appeared to agree that if it went through, the Chapter 11 proceeding would be effectively over. In the words of counsel for the petitioning creditors, if the sale were carried out, "this court would have been divested instantly of any meaningful proceeding . . . ." (Tr. January 21, 1980, p. 11, 11. 20–22).

The bond, however, was not posted, and the sale went through. Now, over a year later, and after Hollywood has paid over $700,000 pursuant to the Asset Purchase Agreement, retained the employees by paying their unpaid wages and turned the company around, the petitioning creditors, holding approximately 15% of the total outstanding unsecured indebtedness, argue that this court does, in fact, yet have a meaningful proceeding before it. They argue that somehow the *status quo ante* can be restored and competitive bidding can yet occur between Hollywood and Darby. To begin, it should be noted that Darby's proposed offer is quite similar to the agreement that Hollywood has been faithfully carrying out for the past year. An examination of the Ashkin Affidavit reveals that he proposed to pay basically the same price as Hollywood except he would pay half the purchase price immediately, and the other half on November 1, 1980. However, he only proposed to purchase Bioline's "good" accounts receivable whereas Hollywood is paying 10% of the face amount for receivables outstanding over 90 days but not yet turned over to collection agencies. "Good" accounts receivable would presumably not include the sizeable Phillips receivable. This is interesting in that the petitioning creditors have made much of the fact that Hollywood supposedly "forgave" Phillips this receivable when, in fact, they simply did not purchase it, just as Ashkin does not propose to buy it. At the August 7, 1980 hearing, Ashkin stated that he would add to his proposed offer $60,000 representing the same amount that Hollywood was paying to Phillips pursuant to the Asset Purchase Agreement for consulting services and for agreeing not to compete with it (Tr. August 7, 1980, p. 37, 11. 9–21). This token sweetening of the pot is not impressive, however, in light of the fact that Darby has had the use of its money during the approximatley

seven months between the bulk sale and the August 7 hearing, during which time Hollywood has paid out over $600,000 pursuant to the Asset Purchase Agreement.

Furthermore, Hollywood, by paying approximately $598,229 to Trefoil soon after the bulk sale, paid approximately 40% of the purchase price at or near the date of closing. Thus the bulk sale, and Darby's proposed offer hardly differ in this respect. The only significant difference, thus, is the time of the payout—Hollywood making its last payment on November 30, 1982, while Darby proposed to pay the full amount by November 1, 1980. Otherwise the bulk sale and the proposed offer are quite similar.

One of the petitioning creditors' most persistent arguments as to why this court should look askance at Hollywood is that little is known about its financial viability, and thus its contracts and guarantees are of questionable worth. Before this proceeding was commenced, neither of these companies was familiar to this court. Serious allegations have been made against both. The petitioning creditors have alleged that Hollywood was formed solely to "rape" Bioline in collusion with Phillips, and Bioline alleged that Darby is in this case for the sole purpose of destroying the deal between Hollywood and Bioline, thereby forcing Bioline into liquidation, thus ridding itself of a nearby competitor. Actions, however, speak louder than words. On the one hand, Hollywood has consistently done what it promised or what was requested of it. I suggested that it guarantee at least 50% payment to unsecured creditors, which was readily done. Hollywood went through with the bulk sale, freed the assets by paying $598,000 to Trefoil, and has made timely payments pursuant to the Asset Purchase Agreement.

Darby, on the other hand, failed to post the $500,000 bond, a relatively simple matter for any reasonably substantial company. It argues that it would have put up the bond but for the fact that it feared that Phillips would purposely cause or create damages by discontinuing his business or by other means, and then seek indemnification under Darby's bond. I find this argument to be entirely without merit. The express purpose of the bond was to indemnify Bioline for damages caused by the delay occasioned by the petitioning creditors' motion, not by Phillips' vindictive destruction of his own assets. Furthermore, the contempt powers of this court and the district court in such a case are wide.

It is interesting to note that, as a result of the petitioning creditors' motion, Hollywood has given something, i. e., its guarantee of a minimum 50% payment to unsecured creditors, while Darby has given up nothing.

If there was any question as to Hollywood's financial viability at the outset of this matter, it has since evaporated. It has paid approximately half the purchase price for the assets, claims to have put substantial additional capital into the company in order to replenish inventory, has retained the employees, and has undertaken to settle substantial liabilities with the Internal Revenue Service and the Drug Enforcement Agency. I note that the expense of negotiating such settlements could be substantial charges against the estate in any proceeding before this court which would ultimately have to be borne by creditors. Instead, Hollywood has undertaken these often time consuming expensive tasks.

In the case *In re Luftek*, 6 B.R. 539, 6 Bankr.Ct.Dec. 1083 (Bkrtcy.E.D.N.Y.1980), Judge Radoyevich of this district had occasion to apply Section 305 of the Code. In that case, as in the instant case, an involuntary petition was filed by three creditors against a debtor which was not meeting its debts as they matured, rendering it technically eligible for the relief sought by the petition. Judge Radoyevich found that thirty of Luftek's creditors, "a substantial body of creditors holding a substantial part of its debt" (*Id.*, 6 B.R. 539, 6 Bankr.Ct.Dec. at 1089) opposed the involuntary petition; that serious disputes surrounded the validity and amount of the petitioning creditors' claims; that one of the petitioning creditors, Charleston Welding & Engineering Co., had a claim which had lain dormant

since early 1977 and had since then paid money to Luftek on certain contracts without asserting a setoff despite opportunities to do so; that in March of 1979, however, Charleston was acquired by a Luftek competitor and now it suddenly pressed the old claim in the involuntary petition; that Luftek was in various stages of completion of several lucrative construction jobs which, when completed, would provide substantial funds which would be available to creditors; that if a liquidation took place, these contracts could be disaffirmed resulting in the loss of substantial receivables; that Luftek "has shown its willingness to pay [its] creditors in full by entering into a loan commitment. . . .", and that "administration expenses would consume the meager assets of this debtor in the event that bankruptcy liquidation takes place." (*Id.* 6 B.R. 539, 6 Bankr.Ct.Dec. at 1088). He held, therefore, that "[w]ith or without the loan commitment, it is apparent that the best interests of creditors and the debtor would be better served by dismissal under section 305(a)" (*Id.*).

In discussing the amenability of that case to relief under Section 305(a) of the Code, Judge Radoyevich noted, 6 B.R. 539, 6 Bankr.Ct.Dec. at page 1089:

"the willingness of the alleged debtor to make arrangements out of court for the repayment of its debt; the fact that some steps have been taken to effectuate such an arrangement; acquiescence in the alleged debtor's motion by a substantial body of creditors holding a substantial part of its debt; and the nature of the relationship which exists between the alleged debtor and one of the creditors who has petitioned for the order for relief."

There are striking similarities between that case and the instant case. Bioline has arranged an out of court settlement by which its assets will be freed from the lien of its secured lender and its unsecured creditors will receive at least 50¢ for each $1 of claim. A sizeable majority of its unsecured creditors support this arrangement, while only a small minority oppose it. Finally, although not the parent of one of the peti-

tioning creditors as in *Luftek*, a competitor of the debtor, with questionable motives, lurks in the background of both cases.

In *Luftek* it was found that, if a liquidation were to take place, unsecured creditors would likely see no dividend. Although this may not necessarily be so in this case, it does appear that its unsecured creditors are due to receive a substantially larger payment than they would receive in a liquidation. Under the Asset Purchase Agreement, the approximately $1.1 million worth of unsecured claims are due to receive $656,777, an approximately 60% payment stretched over two years. Hollywood alleges that it is paying $200,000 over the book value of the assets (Sawyer Affidavit ¶¶ 5–6, filed November 28, 1980). The petitioning creditors, on the other hand, allege that substantial "write-downs" or "write-offs" were taken from the assets. On the basis of the letters submitted after the January 9, 1981 hearing by the petitioning creditors and Wallman, I am satisfied that no such "write-downs" or "write-offs" occurred. For the purpose of this discussion, let us assume that Hollywood, pursuant to the Deloitte report, is paying the fair book value for the assets, despite the fact that it appears that it has added certain amounts to it.

In the case at bar, if Bioline were liquidated, it is obvious that general unsecured creditors would receive substantially less than they are scheduled to received under the Asset Purchase Agreement. It is my opinion that the expense of liquidation, including fees for appraisers, auctioneers, trustees, attorneys and accountants would eat up a major portion of any recovery. It is indeed a rare case, both under Chapter 7 or Chapter 11 of the Code, that unsecured creditors recover over 50%.

Of course, the petitioning creditors contend that Darby, which is in the wings, is prepared to make a "better offer" for these assets than Hollywood's. This proposed offer—it never made a firm one—is similar to Hollywood's except that it would be paid more quickly. It must be remembered that Darby was given the opportunity to make

this "better offer" over a year ago by showing its good faith by posting a bond to indemnify Bioline for any damage it might sustain by reason of its loss of the Hollywood agreement. It also must be remembered that neither Darby nor the petitioning creditors availed themselves of that opportunity and the bulk transfer was thus consummated and the assets have been in Hollywood's hands for over a year during which it has paid over $700,000 pursuant thereto. It was over a year ago that counsel for the petitioning creditors, who now urges me to set the sale aside, said that if the sale were carried out "this court would have been divested instantly of any meaningful proceeding ..." (Tr. January 21, 1980, p. 11, 11. 20–22). I agreed with him then and I do now. I cannot see how the sale, which took place over a year ago, can now be set aside. Hollywood has expended large sums of money to satisfy the liens on the property; it has paid the back wages to employees who had not been paid and has retained their services; it has diligently, faithfully and meticulously carried out the terms of the Asset Purchase Agreement so that the escrow agent now has sufficient funds to pay a substantial dividend to unsecured creditors; it has made arrangements for the payment of taxes and has turned an unsuccessful company around to where it is thriving. To divest it of the assets now, in order to satisfy the demands of a group of recalcitrant creditors who hold approximately 15% of the debt and who are doing the bidding of a competitor, would be grossly unjust to all other creditors, Bioline and Hollywood.

The legislative history to Section 305 of the Code states that:

"[t]he court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 325 (1977); S. Rep. No. 95–989, 95th Cong., 2d Sess. 35 (1978)."

I find that, except for the fact that the petitioning creditors have not openly sought to use this proceeding to provide a basis for future threats to extract full payment, this statement accurately describes the situation before me. An arrangement between the debtor and its creditors, not prejudicial and indeed favorable to the latter, has been worked out out of court. The involuntary case is being pressed only by a small group of recalcitrant creditors in the face of approval of the out of court settlement by over 60% of the unsecured creditors.

Among the purposes of a chapter proceeding under the bankruptcy laws is to preserve the going-concern value of debtors, thereby preventing disruptions in the marketplace. *See* excerpt from the Report of the Judiciary Committee of the House of Representatives of June 2, 1933, reprinted at 11 Remington on Bankruptcy § 4345, p. 14 (1961) discussing Section 77B, the predecessor to Chapter X of the old Bankruptcy Act. In the instant case, the goal of this policy was achieved by the Asset Purchase Agreement—the business of the company was revived and continued under new management and the employees were paid and retained. Ironically, by seeking to commence an involuntary Chapter 11 proceeding, the petitioning creditors, if successful, would likely disrupt this business, a result contrary to one of the policies underlying Chapter 11.

In discussing Section 305 of the Code, Judge Radoyevich made the following admonition:

"It also is apparent that the courts will have to exercise great care in using the discretion granted by section 305(a) to dismiss a case. To be sure, it could be said that dismissal would be in the interests of creditors and the debtor in many of the proceedings commenced under the Bankruptcy Code; this Court could dispose of much of its calendar if its discretion was unbridled. There is an inherent risk to our system of jurisprudence in any Act of Congress which gives the courts

such broad powers to refuse jurisdiction over a case. This risk is compounded by the finality and nonappealability of an order entered under this section. Indeed, by giving an example of a situation in which abstention or dismissal would be appropriate, Congress has indicated that it intended section 305(a) dismissals to be the exception rather than the rule." (*In re Luftek, Inc.*, 6 B.R. 539, 6 B.C.D. 1083, 1088–89).

I agree with Judge Radoyevich. I find, however, that the facts of the instant case, much like *Luftek*, warrant my decision to abstain from exercising any further jurisdiction over this proceeding pursuant to Section 305 of the Code. Accordingly, the involuntary Chapter 11 petition is dis-

missed. This renders moot the motions for summary judgment and to set aside the bulk sale as a fraudulent conveyance made by the petitioning creditors.

I shall retain jurisdiction for the sole purpose of granting Bioline's motion authorizing Rosen, as escrow agent, to distribute, to unsecured creditors, the funds collected and earmarked for them pursuant to the Asset Purchase Agreement.

Submit order in conformity herewith.