In re MORTON SHOE COMPANIES, INC., Debtor.

PREVUE PRODUCTS, INC. and Hampshire Manufacturing Corporation, Plaintiffs,

v.

MORTON SHOE COMPANIES, INC., Defendant.

No. 00007–HL.
Adv. No. 82–504.

United States Bankruptcy Court, D. Massachusetts.

Nov. 24, 1982.

Harris G. Gorab, Choate, Hall & Stewart, Boston, Mass., for debtor/defendant.

William F. Macauley, Craig & Macauley, Boston, Mass., for plaintiffs.

## MEMORANDUM ON CLAIM AND COUNTERCLAIM

HAROLD LAVIEN, Bankruptcy Judge.

The controversy in this proceeding arises out of the sale of the debtor's stock in its manufacturing subsidiary, Hampshire Manufacturing Corp, (Hampshire) to Prevue Products, Inc. (Prevue). The terms of the sale were encompassed in a lengthy agreement dated July 31, 1981, as amended October 2, 1981. (Agreement). Prevue is now claiming that it is owed money by Morton Shoe Companies, Inc. (Morton), the debtor, both for breaches of the Agreement and under the specific terms of the Agreement.

1. Morton also made this claim under the Uniform Fraudulent Conveyance Act, N.H. Revised State. Ann. 545–1 et seq. and Mass.Gen. Laws ch. 109A. At the trial, counsel agreed that as a practical matter, 11 U.S.C. § 548 was the same as the state law provisions and therefore the Court will treat this aspect of the proceeding as a § 548(a)(2) claim.

The largest controversy involves a dispute over the contract purchase price as set forth in the Agreement. Morton has denied Prevue's allegations and has also counterclaimed for amounts due it under the Agreement and further that the sale was a fraudulent conveyance in violation of 11 U.S.C. § 548.[1] There are nine counts and a three count counterclaim to be determined.

A two day trial was held and counsel have filed lengthy pre and post-trial briefs. Since each count deals with separate parts of the Agreement, each count will be considered separately with the relevant findings of fact and rulings of law necessary thereto.

In Count I, Hampshire claims that Morton breached its representations and warranties under paragraphs 4(j) and 4(g)(xii) of the Agreement. Specifically, those sections required Morton to disclose all litigation pending or threatened against Hampshire and paragraph 15 requires Morton to indemnify Hampshire for any loss due to undisclosed liabilities. There was an April 1979 lawsuit by Rose, Goldberg & Associates against Hampshire which Morton concedes it never disclosed. The lawsuit was eventually settled for $1,000. Prevue seeks recovery of the $1,000 plus $1,647.68 in legal fees. Morton argues that the lawsuit was so insignificant that their failure to disclose was not a material breach. Paragraph 15 of the Agreement clearly requires the seller to indemnify the buyer for any undisclosed liabilities and there is no materiality limit. While the legal fees may seem high based on the small settlement, Morton offered no evidence to show that the legal work was excesssive or that the lawsuit was frivolous. Based upon the pleadings from that suit which were offered as exhibits, it appears that the plaintiff had a serious claim[2] and Morton

Morton made an additional counterclaim based on unfair and deceptive acts. That counterclaim was dismissed in an earlier proceeding.

2. One criteria for a fee is the result accomplished. Here, the plaintiff was claiming

offered no evidence to the contrary. Therefore, I find that Prevue is entitled to its entire claim under Count I of $2,647.68.

■ Under Count II of the complaint, the Court is asked to determine who is entitled to excess pension plan funds of $100,000. The pension plan was terminated pursuant to the Agreement and the overfunding has apparently come as a surprise to everyone. In ¶ 13(ii) of the Agreement, Morton agreed to reimburse Prevue for any liability due to any underfunding of the pension plan. There is no provision in the Agreement covering the ownership of any excess funds. On the transfer of the stock, Prevue acquired all the assets and all the liabilities of Morton except to the extent that the Agreement provided otherwise. Since the excess funds were an asset of Hampshire and a contrary distribution was not provided for in the Agreement, the excess funds belong to Hampshire and then to Prevue, as the 100% stockholder. *First National Bank of Birmingham v. Perfection Bedding Co.,* 631 F.2d 31 (5th Cir.1980). Incidentally despite the obligation of Morton, prior to the plan termination, Prevue paid in $34,132 and to that extent is simply recovering its own money. These funds are being held by the fund administrator who is directed to turn them over to Prevue. As part of this claim, Morton requests that the Court find that all recovery from certain custom litigation Hampshire is involved in belongs to Morton. Morton points to no reservation in the Agreement which would provide it with such a right. Further, the evidence shows that in 1980, Hampshire management promised to rebate any recovery on this litigation to its customers. Therefore, I find that Morton has no claim to this litigation.[3]

In Count III, Prevue makes a claim to $12,000 in insurance proceeds for certain molds stolen from Hampshire prior to the closing. Morton has conceded judgment to Prevue on Count III of the complaint.

■ In Count IV, Prevue alleges that Morton should reimburse Prevue for the amounts it paid due to the cancellation of the lease of a Kenworth tractor by Hampshire. Paragraph 13(ii) of the Agreement provides that:

It is hereby understood and agreed upon between the parties hereto that neither Hampshire nor Buyer shall have any liability whatsoever which arises out of or results from the acceleration or default or any machinery or equipment lease set forth in Exhibit Y attached hereto and made a part hereof which has been abandoned by Hampshire or Buyer and it shall be the obligation of Seller to pay such amounts which become due as a result of such acceleration or default.

The lease of the tractor was terminated in July 1982 when Hampshire paid $6,082.48 to the lessor, Patsy's Leasing Corp. Morton argues that there was no evidence introduced as to the reasonableness of the payments and no evidence was introduced showing that Hampshire notified Morton that it was going to make any payment. Therefore, Morton argues, Hampshire was a volunteer. The evidence does show that the lease was included in Exhibit Y to the Agreement and that Prevue notified Morton by letter of November 18, 1981 that it had no interest in the tractor. The Agreement clearly states that Morton would pay the amount that became due as a result of any default. While Morton may be correct that Prevue failed to notify Morton that they were going to pay, Morton offered no evidence that the payment was other than the amount due under the lease. Therefore, I find that Morton owes Prevue $6,082.48 on Count IV.

■ In Count VII, Prevue alleges that Morton failed to fulfill its obligation under

---

$2,000,000 in damages which was certainly somewhat outlandish considering that the suit was settled for $1,000. Nonetheless, the ad damnum called for reasonable attention by counsel and the result indicates a workmanlike performance by counsel.

**3.** In its discussion of contingent assets and liabilities, Prevue raises the issue of four pending or threatened lawsuits which arose before the closing. Prevue has made no claim based on these lawsuits and the Court assumes that they were mentioned by way of analogy only.

¶ 5 of the Agreement. Paragraph 5 states that Morton will cause Peat, Marwick, Mitchell & Co. to do an audit as of the closing date. That audit was to include the 4(q) calculation which is the main problem in determining the purchase price and will be discussed later in this opinion. Paragraph 5(b) provided that Morton and Prevue would each be responsible for 50% of the cost of the audit. Mr. Compton, of Peat, Marwick, Mitchell & Co., testified that his firm had completed most of the audit and in fact, a draft balance sheet was prepared which was used as the starting 4(q) value. It is true, however, that a complete audit pursuant to ¶ 5 was never done. Prevue now seeks to charge Morton for the legal and accounting costs and expenses incurred in completing the audit. However, Mr. Compton testified that Peat, Marwick, Mitchell & Co., was in the process of trying to iron out what they felt were ambiguous parts of the Agreement when the instant lawsuit was filed.[4] Clearly, Prevue's accountant has done a thorough job preparing financial statements and doing the 4(q) determination. However, the accountant was not doing the work as a substitute for ¶ 5 of the Agreement, but in preparation for a complicated lawsuit. Morton is not obligated to reimburse Prevue for these expenses because these are not the type of expenses which were contemplated under the Agreement. Compton estimated the audit work as 99% complete; in fact, their reserves for returns and allowances were slightly more favorable to Prevue than the figures produced by Prevue's accountant and this was the largest single aspect of the work performed by them.

■ In Count IX, Prevue alleges that Morton owes it $59,148.99 for undisclosed accrued liabilities that existed as of the closing date. The various accruals are $39,-289 for workmen's compensation premiums, $12,200.71 for employee dental insurance premiums and $7,659.28 for legal services. Paragraph 4(m) of the Agreement provides:

m. *Absence of Undisclosed Liabilities.* As of the Closing Date Hampshire will not have any liability of any nature, whether accrued, absolute, contingent or otherwise, including without limitation any tax liability due or to become due, and whether or not incurred in respect of or measured by income, for any period prior to the Closing Date, or arising out of any transaction entered into, or any state of facts existing prior thereto.

Paragraph 15 then provides that Morton will indemnify Prevue for any undisclosed liability of Hampshire as of the closing date. The evidence shows that Prevue has paid these liabilities. Morton first argues that the workmen's compensation and dental benefit claims did not exist as of the closing date. Morton then alternatively argues that Prevue was in full operational control of Hampshire since May of 1981 and therefore had knowledge of these liabilities. While paragraph 4(m) is labeled "Undisclosed Liabilities", it in fact obligates the seller for any liabilities. In fact, Richard Narva, Morton's President, agreed with the Court that Prevue was entitled to a credit for these accruals. I find that Morton was obligated to indemnify Prevue and therefore Prevue is entitled to recover $59,148.99 under Count IX.

Before considering Counts I and II of the counterclaim relating to fraudulent conveyance, the Court will consider Count III where Morton claims that it is owed an additional $750,000 for the sale of the stock. The main issue in this count and tangentially in the fraudulent conveyance claim is the determination of the contract price. The Agreement provides in ¶ 2 that the purchase price for the shares will be $1,500,000. However, this purchase price is modified by ¶¶ 4(q) and 6(b) of the Agreement. Paragraph 6(b) provides that:

b. *Net Asset Adjustment.* If Hampshire's Net Assets as of the Closing Date are less than Three Million Dollars ($3,000,000), then the Seller shall pay to Buyer at the Settlement the difference

---

4. Mr. Compton's exact words were, "Well, they filed suit before we had a chance to iron out the issues that would have gotten to a bottom line."

between Hampshire's Net Assets as of the Closing Date and Three Million Dollars ($3,000,000) in cash.

The method for determining net asset value is set forth in ¶ 4(q). Paragraph 4(q) provides:

q. *Hampshire Net Assets.* As of the Closing Date, Hampshire's net assets exclusive of reserves for chargebacks, write-offs of chargebacks and LIFO reserve (hereinafter "Net Assets") shall not be less than Three Million Dollars ($3,000.000) which Net Assets shall be determined by an audit as of the Closing Date performed in accordance with generally accepted accounting principles applied on a basis consistent with prior years except the following:

i. Raw materials shall not be greater than $1,400,000 at FIFO cost.

ii. Construction in process shall be not greater than $50,000.

iii. Slush tooling shall be carried at 0.

iv. Leasehold improvements for the Claremont Leases shall be carried at 0.

v. The total of accounts payable plus any debt due to Seller less cash shall not be greater than $1,120,000 and Hampshire shall be entitled to a deduction from the royalty payments provided for in the Royalty Contract in the amount by which such total exceeds $1,070,000 and is less than $1,120,000.

vi. Machinery, equipment and capitalized leases shall exclude such machinery, equipment and capitalized leases as are subject to a purchase and sale agreement with or have been offered to COLECO INDUSTRIES, INC. in connection with the sale of Hampshire's recreation business.

vii. Shares of Hampshire's former Subsidiaries or the proceeds of the sales thereof shall be excluded.

viii. Motor vehicles shall be not greater than $40,000.

ix. All agreements regarding returns, discounts and allowances made or entered into prior to the Closing Date shall be recorded on Hampshire's books as of the Closing Date.

x. All credits arising from merchandise returned prior to the Closing Date shall be recorded on Hampshire's books as of the Closing Date.

xi. Inventory owned by Hampshire on June 30, 1980 and the Closing Date shall be priced in the same manner as Hampshire priced its inventory on its June 30, 1980 balance sheet, cost or market, whichever is lower.

xii. Inventory acquired by Hampshire on or after July 1, 1980 shall be priced at FIFO cost.

xiii. The missing Army contract master molds (hereinafter the "Master Molds") shall be carried at 0 and the amount of any insurance proceeds expected to be received by Hampshire with respect to the Master Molds shall be carried at 0.

xiv. Seller's Accountant, as defined in Section 5, shall determine the fixed overhead to be associated with the finished sporting goods set forth in Exhibit V attached hereto and made a part hereof (hereinafter the "Fixed Overhead") for purposes of the calculation specified in Section 6(d).

If the audit required by Section 5 hereof reveals that Hampshire's Net Assets as of the Closing Date are less than Three Million Dollars ($3,000,000), as provided for in subsections (q)(i) through (q)(xii) above, then the provisions of Section 6 hereof shall apply.

The Court finds that ¶ 4(q) is detailed but unambiguous and is determined as follows:

The net assets of Hampshire before the adjustments was $1,852,003. A figure used as a starting point by both sides and derived from Peat, Marwick, Mitchell & Co.'s balance sheet. A determination of the disputed adjustments follows:

Mr. Isaacs, Prevue's accountant, deducted $83,005 as a write down of plant and equipment related to the recreation business to salvage value based on ¶ 4(ee) of the Agreement. Paragraph 4(q) was clearly a going concern valuation of the company with ad-

justments as specified. Paragraph 4(q)(vi) which discusses machinery and equipment says nothing about writing down to salvage value. On the other hand, when a write down is intended, it is so indicated. For example, that same paragraph expressly excludes another portion of the recreational equipment when that result is intended and ¶ 4(q)(xiii) writes off other assets when the write off is intended.

■ The next issue is similar to the one above because Mr. Isaacs deducted $323,646 due to a write down to realizable value of raw materials related to recreation business. Again, 4(q) was a going concern determination and there was no provision for this write down. Further, ¶ 4(q)(i), (xi) and (xii) clearly state that inventory would be priced at cost or market for inventory owned on June 30, 1980 and at FIFO cost for inventory acquired after July 1, 1980. Nowhere does it state that recreational raw materials will be computed at salvage value. Therefore, I find that the $323,646 deduction must be added back into the net asset calculation.

■ The next adjustment is the deductions taken to reflect credits, returns and allowances. The Court ruled during the course of the proceedings that ¶ 4(q)(ix) and (x) unambiguously required that net asset value be reduced by the actual amount of credits issued to customers. Morton's witness, Lawrence Alibrandi, the former chief financial officer of the debtor, stated that he interpreted ¶ 4(q)(ix) and (x) to mean that these amounts would only be recorded, not deducted. Considering the purpose of 4(q) Alibrandi's statement is hardly a plausible explanation. Since 4(q) clearly stated an actual formula for determining net asset value, it would seem absurd to state that other paragraphs in 4(q) required an adjustment whereas (ix) and (x) only required a recording. Net assets must be affected either by the reserve or actual credits. In arriving at the 4(q) computation, the Peat, Marwick, Mitchell & Co. reserves of $847,-245 was added and the actual credits of charge backs of $740,467 was subtracted. If Morton does not want to subtract the actual figures, then it must put back the reserves. One or the other must be the in net asset computation. I find that the contract provides for the use of the actual credits.

Morton sought to offer evidence that the Agreement was ambiguous and should be interpreted differently. However, early in the proceeding the Court ruled that 4(q) was unambiguous and parol evidence was not admissable. Mr. Isaacs arrived at the actual returns and allowances figure by analyzing seven drawers of documents not previously recorded on the company books. Mr. Isaacs determined that the actual amount of credits was $622,320 and chargebacks was $118,147 as compared with the reserve of $847,285. The actual amount of credits and chargebacks should be deducted in determining net asset value and therefore does not get added back in.

The next issue concerns the $100,000 in excess pension funds and whether or not this amount should be added to the assets. Prevue argues that this was at best a contingent asset as of the closing date and therefore should not be added in. However, Morton points out that the excess funding was disclosed in the Peat, Marwick, Mitchell & Co. draft balance sheet of September 25, 1981. I have already found that that was an asset that Prevue acquired in the purchase. It seems only fair that if this asset was known about as of the closing date, that it should be added into the net asset calculation. Therefore, I find that the $100,000 excess pension funds should be added to the 4(q) calculation.

Another deduction Mr. Isaacs made was to deduct $12,000 for insurance proceeds due for missing molds which had been paid to Morton. Morton has now conceded that this money belongs to Prevue and will pay it. However, this $12,000 should not be added back into the net asset calculation because of the specific provision of ¶ 4(q)(xiii).

Mr. Isaacs also deducted $59,149 for accrued liabilities not recorded. Since the Court has found that these liabilities are obligations of Morton and will be paid by

Morton, they should be added back into the net asset calculation. Otherwise, as Mr. Isaacs admitted, Prevue would be paid twice.

Finally, at the trial, Mr. Alibrandi raised a question as to Mr. Isaacs' deduction of $176,481 for adjustment of sporting goods cost. He stated that he believed the item should be less; however, no evidence was offered as to what that lesser figure should be. Therefore, I find that this item should not be changed.

### SUMMARY OF NET ASSET CALCULATION

| | | |
|---|---|---|
| From Ex. 27 | Net Assets | $1,852,003 |
| Item #5 | Add Back Writeoff on Recreation, Machinery and Equipment | 83,005 |
| #15 | Add Back Writeoff on Recreational Raw Material | 323,646 |
| | No change for Credits and Chargebacks | – 0 – |
| | Excess Pension Funds | 100,000 |
| | Add Back Accrued Liabilities | 59,149 |
| | TOTAL | $2,417,803 |

Thus, under the formula of ¶ 6 the buyer, as this portion of the consideration, must pay $1,500,000 less ($3,000,000 – $2,417,803) $582,197 or $917,803; since $750,000 has already been paid, a balance of $167,803 [5] is due on the purchase price.

■■■ In Counts I and II of its counter-claim, Morton has alleged that the sale of Hampshire's assets was a fraudulent transfer in violation of 11 U.S.C. § 548(a), New Hampshire law and Massachusetts law. For this determination, the test to be applied is set forth in § 548(a)(2)(A) and (B)(i).[6] Since the state law sets forth the same test, the Court's analysis will henceforth be limited to § 548. Section 548(a)(2) does not require intent to defraud. The standard is an objective one such that if the Court finds that the debtor conveyed while insolvent for less than a reasonably equivalent value within a year of the filing, a fraudulent conveyance exists.

The debtor now finds that the deal it painstakingly negotiated did not turn out as well as expected and seeks, by virtue of its Chapter 11 and § 548, to have the law renegotiate its deal.

There is no dispute that the transfer took place within one year of the filing so that the debtor's burden is to prove that it was insolvent on October 6, 1981 (the day of the

---

**5.** Morton's contention was that everyone knew of the water in the books and that is why the price was $1,500,000 instead of $3,000,000 and no additional deductions were intended. Both sides were represented by competent counsel who spent months putting together this 40-page Agreement with its multiple exhibits, ¶ 4(q) and ¶ 6(b) which are quite explicit. Certainly, it would have been far simpler to have stated that the adjustments having been factored into the price, there will be no further adjustments. This contention would not only violate the parol evidence rule and impugns the integrity and ability of the draftsperson, it would indicate that the agreement wasn't read before it was signed by Morton's President who is himself a member of the Bar. There is no reason why the parties could not have made that agreement had they so chosen; its just that they didn't and no matter how much Mor-

ton may wish they had, they cannot now re-write the unambiguous terms of paragraphs 4(q) and 6(b).

**6.** § 548. Fraudulent transfers and obligations

(a) The trustee may avoid any transfer of an interest in the property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

Closing) and that Prevue did not pay reasonably equivalent value.

Both issues present Morton with the problem of convincing the Court to accept the hindsight and self interest of its witnesses who recant their earlier contemporaneous evaluations. For example, Prevue relied on the Form 10Q for Morton Shoe Companies, Inc., for the 13 weeks ended September 26, 1981, filed with the Securities and Exchange Commission. This financial statement indicated that the debtor had a positive net worth as of that date. Morton's expert, Frederick McCarthy of Drexel Burnham Lambert, had also originally relied on the Form 10Q solvency when his company rendered an opinion of the sale. However, Mr. McCarthy now testified to substantial inaccuracies in the 10Q to the extent that a company showing a positive net worth would really have been $14,000,-000 in the hole. McCarthy's firm had been the investment broker in the sale of Hampshire and, in fact, had rendered a fairness opinion on the sale. Morton argues that it is permissible to prove insolvency with values obtained after the petition was filed, the so-called "retrojection" method. While retrojection is permissible, *Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281 (1st Cir.1971), the Court would not be inclined to give much weight to this testimony. However, because the Court finds that Morton received a reasonably equivalent value, as enumerated below, the Court does not have to make a finding on the issue of insolvency.

Under § 548(a)(2)(A), the Court must determine whether Morton received less than a reasonably equivalent value in exchange for the stock of Hampshire. This analysis requires the Court to examine what Morton received for the shares of Hampshire and what the value of Hampshire stock was on the date of the transfer.

The amount Morton received for the shares of Hampshire was an unknown until this opinion, since the contract price was in dispute. According to the Agreement, Prevue was to pay $1,500,000 for the shares based on a net asset book value of $3,000,-000, but Prevue then receives a dollar for dollar reduction in the purchase price to the extent the net asset book value is less than $3,000,000. Based on the above determination that the net book asset value is $2,417,-803, Prevue is obligated to pay $917,803 for the shares of Hampshire under paragraphs 4(q) and 6(b) of the Agreement.

In addition to the amount paid for the shares, Prevue was obligated to pay under ¶ 12(iv) of the Agreement, the balance of the intercompany debt of $1,278,418 owed to Morton. Morton argues in various footnotes of its brief that the payment of the intercompany debt has no impact on the purchase price for the shares of the Hampshire stock. No authority is cited for this statement and the Court does not accept a total disregard of this payment. Hampshire had been losing money and its ability to pay the intercorporate debt was dubious. Mr. Finlay, Prevue's expert, testified that prior to the closing, Morton had already withdrawn $4,250,000 cash on the intercompany debt and that Hampshire was in need of working capital. In Finlay's opinion, Hampshire needed some other funding and on a liquidation basis, Hampshire would not have been able to pay off the intercompany debt. Clearly, even the ability of Hampshire as a going concern to pay the intercompany debt after already being depleted of over $4,000,000 in working capital was highly questionable. Morton itself was in need of cash. The payment of the intercompany debt was certainly of some value to Morton since a possibly worthless asset was turned into cash. The burden was on Morton to disprove Prevue's contention that Hampshire did not have the ability to pay anything on this intercompany debt in October 1981. Morton having offered no such evidence or any other evidence of lack of benefit that it would have received but for the sale, the Court concludes that Morton received $1,278,418 of value when Prevue paid the debt. Morton would have received no payment but for Prevue's purchase.

The final item to be considered in determining the value received by Morton is the royalty agreement entered into between

Morton and Prevue pursuant to paragraph 12(i) of the Agreement. The royalty agreement provides for payment of up to $1,600,000 to Morton in the five years following the sale of Hampshire. The amount of royalties payable is subject to the level of Hampshire's sales. Mr. Isaacs, Prevue's accountant, testified that post acquisition year one sales should result in the maximum royalties being paid. However, counsel was quick to add that there are offsets and there may be other problems.

Morton argues that since there is no guaranty of any royalties as of the date of the sale, valuation of the royalties would be speculative and unreliable. Therefore, Morton claims the royalty provision has no value. The cases which Morton cites for the proposition that promises of future performance are "without a fair consideration", are not determinative of the issue. In these cases, *Hulsether v. Sanders,* 54 S.D. 412, 223 N.W. 335 (1929); *Virgil State Bank v. Wahl,* 56 S.D. 318, 228 N.W. 392 (1929); *Sandler v. Parlapiano,* 236 App.Div. 70, 258 N.Y.S. 88 (1932); *Cooper v. Cooper,* 22 Tenn.App. 473, 124 S.W.2d 264 (1938), an asset was transferred to a relative in exchange for a promise of support or agreement to pay some debt. These types of future promises are readily distinguishable and present a quite different valuation problem. In fact, 11 U.S.C. § 548(d)(2)(A) excludes an unperformed promise to support the debtor or the debtor's relative from the definition of value.[7] In contrast in the instant case, we have a contractual provision which is the result of some hard bargaining between the parties. Morton offered no evidence to show that the royalties would not be earned. *See Collier on Bankruptcy,* ¶ 548.09 at 548–95 n. 12 (burden of proof with respect to the insufficiency of consideration would seem to properly rest on the trustee [debtor-in-possession]). In fact, a Drexel Burnham Lambert internal memorandum of October, 1981, written by Frederick McCarthy, Morton's expert, as part of their fairness opinion on the sale, concluded that the present value of the royalties was approximately $925,000. However, the opinion did state that there was great uncertainty and there was a possibility of no royalties. In determining value, the Court must look to all the circumstances of the case. *In re North Babylon Estates, Inc.,* 30 F.2d 372 (2nd Cir.1928). Here, the sale of Hampshire was an armslength transaction. There has been considerable testimony as to the intensity of the negotiations. Prevue was purchasing Hampshire with the intent to operate it, and there was a reasonable likelihood that sales would be generated and royalties paid. I find that the royalty agreement had value on the date of the sale, and while the only evidence of valuation is the $925,000 McCarthy estimate, even if I were for this purpose to discount this valuation 50% that would produce a valuation of $462,500.

Therefore, I would find that Morton received value in excess of $2,000,000 probably as much as $2,600,000 [8] in value when it sold Hampshire to Prevue.

The next issue to be determined on the fraudulent conveyance claim is what was the value of Hampshire on the date of the transfer. The determination of the "fair valuation" of the corporation's stock at a specific time is at best an inexact science and may often be impossible. *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573

---

7. The debtor cites two other cases for the proposition that no value can be attributed to the royalties, *In re Bioline Laboratories, Inc.,* 9 B.R. 1013 (Bkrtcy.E.D.N.Y.1981) and *Keener v. Sizzler Family Steak House,* 597 F.2d 453 (5th Cir. 1979). In *Bioline,* the court did not consider the argument that value pursuant to § 548(d)(2)(A) does not permit payments over time. Rather, the court abstained from the proceeding, rendering moot the fraudulent conveyance argument. *Keener* relates to Texas law which does not permit damage recovery for future profits for a newly established business or a business operating at a loss and is really not applicable to a determination of value for § 548 purposes.

8. The ¶ 6(b) portion of the

| | |
|---|---|
| Purchase Price | $ 917,803 |
| Intercompany Debt | 1,278,418 |
| Royalty Agreement | 462,500 (potentially |
| | $1,600,000) |
| | $2,658,721 |

(1st Cir.1980). The Court is aware that many methods can be used to value closely held corporate stock including capitalization of earning capacity, *Matter of King Resources Co.,* 651 F.2d 1326 (10th Cir.1980), or a ratio comparison with comparable companies. *Id.* Because of Hampshire's lack of current earnings, the capitalization method is not feasible. Where the problem is the difficult one of ascertaining the fair market value of the stock of a closely held corporation, the Court relies on the testimony of experts in arriving at an informed judgment. *See Central Trust Co. v. United States,* 305 F.2d 393, 158 Ct.Cl. 504 (1962).

The debtor's principal witness on valuation was Frederick McCarthy of Drexel Burnham Lambert. Mr. McCarthy did not use a capitalization of future earnings approach nor did he use ratios such as book value to market price of comparable companies but used instead a ratio of consideration received to net book investment. McCarthy started with Isaac's determination of net book assets and added back a $200,000 adjustment on sporting goods costing because the adjustment did not reflect market value. He also added in the pension claim of $100,000, $400,000 for the customs litigation, subtracted something for legal fees, added $500,000 to cover the $2,600,000 tax loss carry forward, used a 16–17% discount factor and came up with a value of $2,000,000. The two million dollars was characterized as conservative since he did not include good-will.

Lon Compton from Peat, Marwick, Mitchell & Co. testified based upon his firm's draft financial statements which showed a stockholder's equity of $1,300,000. To this figure, he added $98,000 for a workmen's compensation receivable, $100,000 for the overfunded pension fund and the LIFO reserve of $777,717 to come to a stockholder's equity of $2,276,795.

Allan Finlay testified for Prevue. Finlay had previously worked for the investment firm of Scudder, Stevens and Clark. Finlay states that he did not do a capitalization of indicated earnings because of escalating losses, the decrease in volume due to shut down in products and the lack of working capital with which to resume volume. Morton correctly argues that a single loss year could be normalized or disregarded in computing the average of earnings. *See Fitts Estate v. Commissioner,* 237 F.2d 729 (8th Cir.1956). However, none of Morton's experts presented any evidence on a value based on capitalized earnings.[9] Therefore, the Court assumes that a capitalized earnings value would have produced a low valuation.

Finlay then evaluated the company based on price-book value ratios of marketable comparable companies. Finlay begins with the $1,300,000 in stockholder's equity on the draft balance sheet, adds back the LIFO reserve of $777,717 [10] to come to a stockholder's equity of $2,078,228 on FIFO basis. Finlay then adds in the intercompany debt of $1,278,418 to come to a total book net asset value of $3,356,646. Finlay then uses five comparable companies with price to book value ratios of .53 to .64, average of .57. For many reasons including the increased losses, negative earnings growth, negative return on equity, no dividend paying capital, working capital needs, Finlay

---

**9.** In fact, the Drexel Burnham Lambert Memorandum by McCarthy (Ex 31, at 3) states that
>  Traditional valuation methods that focus on earnings, such as price-earnings multiple methods and dividend discount models, are not applicable to this situation because of the heavy losses incurred by Hampshire during fiscal 1980 and 1981 and the first eleven weeks of fiscal 1982 as well as the inability to project future earnings within any reasonable degree of confidence. An alternative valuation method that is not dependent on current earnings and is therefore available in this case, is one based on the ratio of book value

to market price. In particular, we focus on the ratio of the total consideration received by Morton to Morton's total net book investment in Hampshire. Because of the very uncertain nature of the royalty payments, we look at the net consideration received both with and without the assumption of royalties.

**10.** No adjustment for taxes was made when adding back the LIFO reserve although usually a 46–50% adjustment would be made. Finlay stated that the net operating loss carryforward would balance this adjustment.

concludes that Hampshire's shares should sell at a lower percentage of book value than any of the five comparable companies. He uses a .40 ratio and concludes that Hampshire's value was no greater than $1,350,000. If the average ratio of .57 was used, the value would have been $1,913,288. The highest price to book value ratio of Finlay's five comparable companies was that of Barry (R G) at .64. Even using the highest ratio of 64%, the value of Hampshire would be $2,148,000. Morton's own experts have estimated the value of the company at something between $2,000,000 and $2,359,000.[11] Even when using Finlay's over generous addition of the intercompany debt his figures range from a value of $1,350,000 to a high of $2,148,000.

The Court wondered why the intercompany debt was added back in to determine adjusted book value. Finlay's explanation was that he was told that the intercorporate debt should be considered part of the equity. When asked by the Court what would happen without this assumption, he stated that he doubted there would be any equity left since he questioned the company's ability to pay the debt.

On the assumption that the buyer will also agree to pay the intercompany debt, I find that the fair market value of Hampshire's stock on the date of the transfer was the $1,300,000 as shown on Peat, Marwick, Mitchell & Co.'s statement and as supported by Finlay's analysis of the ratio of book value to market price.

Having determined that Morton received in excess of $2,000,000 and probably at least $2,600,000 in value, I find that the transferor did not receive less than a reasonably equivalent value. The sale of Hampshire stock to Prevue was not a fraudulent conveyance under 11 U.S.C. § 548.

In summary, the Court finds as follows. Prevue is entitled to the following recoveries on the counts of its complaint:

| | | |
|---|---|---|
| Count I | $ 2,647.68 | |
| Count II – Prevue is entitled to the excess pension funds. | | $100,000 to be paid by the administrator |
| Count III | | $12,000 insurance proceeds to be paid to Prevue |
| Count IV | 6,082.48 | |
| Count IX | 59,148.99 | |
| | $67,879.25 | |

Morton is entitled to recovery under Count III of its counterclaim the remainder owed on the purchase price of $167,803.

Morton argues that any recovery for Prevue must be set off against royalties. However, I need not consider that argument since Morton is entitled to a net recovery of $99,923.85 under the above findings, less an additional $12,000 if the insurance proceeds have been received by Morton.

The Court would further note that in its brief, Prevue concedes that it owes royalties to Morton. However, since any affirmative recovery of royalties was not requested in Morton's counterclaims, and no specific sales or expense figures were offered in evidence, the Court makes no order in regard to the royalties.

11. Prior to improperly adding on the $740,000 of credits for returns and allowances.