In re EURO–SWISS INTERNATIONAL CORPORATION, Debtor.

Harry Robert VARON, as Trustee of the Estate of Euro-Swiss International Corporation, Debtor, Plaintiff,

v.

TRIMBLE, MARSHALL & GOLDMAN, P.C., et al., Defendants.

Bankruptcy Nos. 79 B 10245(JL), 80 B 10177(JL).

Adv. No. 81–5735–A.

United States Bankruptcy Court, S.D. New York.

Sept. 26, 1983.

As Corrected Oct. 18, 1983.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for trustee; Richard Lieb, and Igor Krol, New York City, of counsel.

Dorfman & Jacobson, Jericho, N.Y., for Sovereign Commodities Group; Jerome Dorfman, New York City, of counsel.

Ira B. Marshall, New York City, for Trimble, Marshall & Goldman and the individual defendants.

Gerald S. Crowley, New York City, for the Port Authority of N.Y. & N.J.

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

Harry Robert Varon, Trustee of the Estate of Euro-Swiss International Corpora-

tion, ("Plaintiff/trustee"), the debtor herein ("Euro-Swiss"), moves for summary judgment under Bankruptcy Rule 756 on the ground that as a matter of law the trustee is entitled to sole ownership of a cash fund of $485,000, representing the proceeds of his assignment and sale of Euro-Swiss' lease with The Port Authority of New York and New Jersey (the "Port Authority") for office space at One World Trade Center, New York, New York (the "Lease"). The Port Authority moves for summary judgment on its cross-claim and counterclaim against the plaintiff for past due post-petition rent and charges in the amount of $60,757.34.

I

## FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

Euro-Swiss sold "deferred delivery" commodities contracts to retail operations which, in turn, sold commodities contracts to the public. The current adversary proceeding stems from a pre-bankruptcy sublease of space and an assignment by Euro-Swiss of the Lease.

From the submissions of the parties in support of and in opposition to the various motions, it appears undisputed that on May 7, 1979, Euro-Swiss entered into the Lease whereby it rented approximately 5,600 square feet on the 102nd Floor of One World Trade Center. The Lease was for a ten-year term commencing October 1, 1979; annual base rent was approximately $65,-000, subject to customary escalations. Simultaneously with the signing of the Lease, Euro-Swiss subleased, with the subsequent written consent of the Port Authority, the most desirable portion of the office to Trimble, Coven & Goldman, P.C. ("Trimble Coven") for an annual rental of $1,200 (the "Sublease"). Neither the Lease nor the Sublease were ever recorded.

Prior to the commencement of the Lease term on October 1, 1979, Euro-Swiss was a subtenant in Trimble Coven's offices at 777 Third Avenue, in New York City. Trimble Coven was general counsel to Euro-Swiss;

a partner, Bernard Coven, owned shares in Euro-Swiss.

Approximately one month after its tenancy in One World Trade Center began, Euro-Swiss was sued by a court-appointed receiver for two of the debtor's major customers. The receiver sought $2.5 million on a breach of contract claim and confirmation of an *ex parte* order of attachment of Euro-Swiss' assets. *See United States v. Coven,* 662 F.2d 162 (2d Cir.1981); *In re Euro-Swiss International Corp.,* 80 Civ. 2559 (R.O.) (S.D.N.Y. October 27, 1980) at 2–3. Levies against the debtor's property, issued pursuant to the *ex parte* order of attachment, were executed on November 9 and 13, 1979. Shortly thereafter, on November 26, 1979, the debtor assigned the Lease with the Port Authority to Trimble Coven for a stated consideration of $10 (the "Assignment"). On the same date, Mr. Coven and the President of Euro-Swiss visited the offices of the Port Authority and prepaid the rent in the amount of $36,000 in an unsuccessful attempt to obtain the Port Authority's consent to the assignment. The source of these funds is not clear. Trimble Coven never recorded the Assignment, its name, however, was affixed to the office door and listed in the building directory.

Eight days after the Assignment to Trimble Coven, certain creditors of Euro-Swiss filed an involuntary bankruptcy proceeding against it under Chapter 7. On February 7, 1980, the debtor filed its own Chapter 11 petition and moved to convert the Chapter 7 proceeding to Chapter 11. This Court dismissed the debtor's voluntary bankruptcy proceeding. Applying the doctrine of collateral estoppel to a prior finding in the attachment case, *Glusband v. Euro-Swiss International Corp.,* 85 F.R.D. 597 (S.D.N.Y. 1979), this Court concluded that Euro-Swiss was a commodities broker and thereby prohibited under § 109(d) of the Bankruptcy Code (the "Code") from filing a Chapter 11 petition. On appeal, the United States District Court for the Southern District of New York reversed. *In re Euro-Swiss International Corp.,* 80 Civ. 2559 (RO) (S.D. N.Y. October 27, 1980). On September 8, 1981, this Court ordered debtor's Chapter 11

proceeding to be converted to Chapter 7. Administration of the debtor's two Chapter 11 proceedings has continued under Chapter 7 and the debtor's assets are in the process of being liquidated.

During these proceedings, the debtor failed to pay rent or even reasonable use and occupancy charges to the Port Authority. Substantial sums were due by December of 1980. The Port Authority then orally consented to the Assignment in exchange for Trimble Coven's agreement to pay rent. The parties entered into a stipulation affirming that Euro-Swiss remained jointly and severally liable on the lease with Trimble Coven, stating:

> WHEREAS, Euro-Swiss International Corporation, the Debtor herein is occupying certain premises at One World Trade Center 10237 New York, New York, pursuant to a certain lease dated May 7, 1979 made by the Debtor with the Port Authority of New York and New Jersey, which lease was assigned to Trimble Coven & Goldman P.C. but which assignment provides that the Debtor and assignee shall both be liable to the landlord;

(Emphasis added.) Stipulation dated December 12, 1980, signed by Euro-Swiss and the Port Authority, so ordered by this Court ("Stipulation").

Shortly thereafter, in March of 1981, Trimble Coven assigned the Lease to Sovereign Commodities Group, Ltd. ("Sovereign"). Once again, the Port Authority did not consent to this assignment, nor was it ever recorded. At about the same time of this assignment, both Mr. Coven and the President of Euro-Swiss were convicted of conspiracy, mail fraud, wire fraud and obstruction of justice for their activities in connection with the attachment proceedings in the fall of 1979. See United States v. Coven, 662 F.2d 162 (2d Cir.1981). While the plaintiff has made many references to these proceedings, he conceded at the hearing on these motions that he did not claim any collateral estoppel effect from the findings in the criminal action or any of the other proceedings.

Although Sovereign, the proposed assignee, did make several payments to the Port Authority, by July 4, 1981, the debtor and Trimble Coven were again in arrears to the Port Authority. Consequently, the Port Authority commenced a proceeding against the debtor in this Court seeking relief from the automatic stay contained in § 362 of the Code so that it could proceed against the debtor for the amount owed. This proceeding was adjourned sine die upon the commencement of an adversary proceeding by the interim trustee, plaintiff's predecessor, to set aside the Assignment and Sublease and to authorize the trustee to assume the Lease free and clear of the interests of the various defendants except the interests of the Port Authority.

On the motion of the plaintiff/trustee herein and with the consent of Trimble Coven, the Port Authority and Sovereign, this Court, by order dated May 21, 1982, authorized the assumption and sale of the Lease to Telerate Systems, Inc. ("Telerate") pursuant to § 365 of the Code, for $485,000 cash. In so consenting, the parties fully reserved any rights they may be determined to have in the Lease and transferred those rights to the proceeds from the Assignment.

The interim trustee's complaint was superseded by an amended complaint filed by the plaintiff herein on July 22, 1982. The essence of the amended complaint is that the Trimble Coven Assignment and Sublease are all void or voidable pursuant to §§ 544 and 548 of the Bankruptcy Code and that the plaintiff, as trustee, be declared the sole owner of the $485,000 cash fund.

In answering the plaintiff's amended complaint, the Port Authority asserted a counterclaim seeking $60,757.34, representing the past due rent and charges, from the $485,000 cash fund. Both the trustee and the Port Authority have moved for summary judgment on their claims.

## II

## SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c), made applicable to bankruptcy proceedings

by Rule of Bankruptcy Procedure 7056, states, in pertinent part, that a judgment in favor of the moving party "shall be rendered [if] [t]here is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The test on a motion for summary judgment is whether the facts set forth in detail in the papers presented on the motion, such as in affidavits, depositions, answers to interrogatories, and admissions on file, show that there are no genuine issues of material fact to be tried. *Burtnieks, City of New York,* 716 F.2d 982, 985, (2d Cir.1983); *Engl v. Aetna Life Insurance Co.,* 139 F.2d 469 (2d Cir.1943); 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.04 (2d Ed.1981).

No longer in the Second Circuit, as in *Arnstein v. Porter,* 154 F.2d 464 (2d Cir. 1946), does the slightest chance that there may exist a genuine issue of fact preclude the granting of a motion for summary judgment. Still, the court does give pause before granting summary judgment because, in doing so, it denies a litigant a trial. *United States v. Bosurgi,* 530 F.2d 1105 (2d Cir.1976); *Heyman v. Commerce and Industry Co.,* 524 F.2d 1317 (2d Cir.1975). This does not mean, however, that the courts of the Second Circuit do not give due deference to the utility of summary judgment as a tool in achieving judicial efficiency and economy. They have frequently recognized "[t]he importance of Summary Judgment in the structure of modern federal practice as a procedural weapon to pierce sham claims and resolve actions where the facts are undisputed...". *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount, Inc.,* 388 F.2d 272, 278 (2d Cir.1967); *see also, Donnelly v. Guion,* 467 F.2d 290 (2d Cir.1972).

On a motion for summary judgment, the moving party has the burden of demonstrating the absence of any material factual

issue genuinely in dispute. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438 (2d Cir.1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).[1] The party opposing the motion has a similar duty: he may not rest upon mere allegations or denials. Fed.R.Civ.P. 56(e). "To avoid summary judgment ... a plaintiff must do more than whet the curiosity of the court; he must support vague accusations and surmise with concrete particulars." *Applegate v. Top Associates,* 425 F.2d 92, 96 (2d Cir.1970). *See also, Schering Corp. v. Home Insurance Co.,* 712 F.2d 4 (2d Cir.1983); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438 (2d Cir.1980).

The fundamental maxim in deciding a motion for summary judgment is that the court cannot try issues of fact; it can decide only if there are issues to be tried. *Heyman v. Commerce and Industry Co.,* 524 F.2d at 1320. *See also United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Schering Corp. v. Home Insurance Co., supra.* If there is no such genuine issue, the parties are not entitled to a trial, and the court, applying the law to the undisputed material facts, may render summary judgment as a matter of law. 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice,* ¶ 56.64[1] (2d Ed.1981). *See also Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *accord S.E.C. v. Research Automation Corp.,* 585 F.2d 31, 34 (2d Cir.1978); *Jaroslawicz v. Seedman,* 528 F.2d 727 (2d Cir.1975). In the final analysis, the acid test in deciding whether to grant summary judgment is whether or not a reasonable inference can be drawn that the issue would be submitted to the trier of facts. If so, the court should deny the motion. *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount, Inc., supra,* 388 F.2d at 279; *Empire Electronics Co. v. United States,* 311 F.2d 175 (2d Cir.1962).

1. In 1963, when Federal Rule of Civil Procedures 56(c) was amended, the advisory committee stated that "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no supporting evidentiary matter is presented." Advisory Committee Note on 1963 Amendment to 56(e), *reprinted in* 398 U.S. at 160, 90 S.Ct. at 1609–10 (1970).

In light of these standards, the trustee's motion for summary judgment on his claims that the assignments are voidable under §§ 544(a) and 548 of the Code must be denied. Similarly, the Port Authority's motion for summary judgment must be granted.

## III

### SECTION 544(a)

From its inception in 1910, the express purpose of the trustee's "strong-arm" powers has been to enable the trustee to strike down "evil" secret liens and other transfers that had evaded the assault of the trustee's other avoidance powers. *See* 45 Cong.Rec. 2277 (1910); 4B *Collier on Bankruptcy,* ¶ 70.45, n. 8 and cases cited therein (14th Ed.1978). Exercise of those strong-arm powers allows the trustee to increase the amount of the potential assets of the debtor's estate thereby providing for a more equitable distribution of the debtor's estate to his creditors. *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); 4 *Collier on Bankruptcy* ¶ 544.01 (15th Ed.1979).

Section 544(a) of the Code continued the basic strong-arm provisions and added a new section affording the trustee the status of a bona fide purchaser. It provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that ob-

tains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; and

(3) a bona fide purchaser of real property from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists.

■ The trustee's entitlement to the hypothetical status of a judicial lien creditor, unsatisfied execution creditor, or bona fide purchaser, pursuant to §§ 544(a)(1), (2), and (3), is a federal question governed by the Code. 4 *Collier on Bankruptcy* ¶ 544.02 (15th Ed.1979); *see also, Commercial Credit Co. v. Davidson,* 112 F.2d 54 (5th Cir.1940). The power conferred by this grant of hypothetical status, depends, however, upon the substantive law of the jurisdiction governing the property in question. 4 *Collier on Bankruptcy* ¶ 544.02 (15th Ed.1979); *see also In re Farmer's Co-Operative Co. of Barlow (No. 2),* 202 F. 1008 (D.N.D.1913); *In re Consorto Construction Co.,* 212 F.2d 676, *cert. den. sub. nom., Klein v. Equity Investment Co.,* 348 U.S. 833, 75 S.Ct. 57, 99 L.Ed. 657 (1954).[2] Here, New York law

---

**2.** The Trustee's exalted status as an "ideal" judgment lien creditor of the debtor and as a creditor possessing an unsatisfied writ of execution against the debtor's property (hereinafter referred to as "judicial lien creditor" and "unsatisfied execution creditor", respectively) contained in §§ 544(a)(1) and (2) are derived from § 70c of the predecessor statute to the current Code. Although the trustee's third status, that of a bona fide purchaser of real property is new, H.R.Rep. No. 95–595, 94th Cong.

1st Sess. 370 (1977); Senate Rep. No. 95–989, 95th Cong., 2d Sess. 85 (1978), U.S.Code Cong. & Admin.News, p. 5787, the purpose of this subsection is the same as that of § 47a of the 110 Act, *viz.,* to empower the trustee to set aside or avoid transfers of or encumbrances on the debtor's property. 4 *Collier on Bankruptcy* ¶ 544.01 (15th Ed.1979). Thus, because § 544(a) is derived, in large part, from § 70c much of the case law interpreting § 70c is still valid as to the meaning of § 544(a).

defines and limits those rights, remedies, and powers.

### A. Judicial Lien and Unsatisfied Execution Creditor Status

There are no material issues of fact in dispute concerning the trustee's claim pursuant to §§ 544(a)(1) and (2). The controversy concerns the status New York affords to a judicial lien creditor and an unsatisfied execution creditor with respect to an unrecorded sublease and an unrecorded assignment of a commercial lease.

■ In New York, a money judgment may be enforced against a wide scope of property interests, including commercial leaseholds. *See* N.Y.Civ.Prac.Law § 5201(b) (McKinney 1978). *Donawitz v. Danek,* 42 N.Y.2d 138, 397 N.Y.S.2d 592, 366 N.E.2d 253 (1977) (concurring opinion J. Jasen); *Lacaille v. Feldman,* 44 Misc.2d 370, 253 N.Y.S.2d 937 (1964); *Henderson v. Tomb,* 169 Misc. 737, 8 N.Y.S.2d 612 (1938). Docketing of a judgment creates a judgment lien against real property. N.Y.Civ. Prac.Law § 5203 (McKinney 1978). Leases are "chattels real", and "chattels real" are defined as real property. N.Y.Civ. Prac.Law § 105 (McKinney 1978). A lien on such property may thus be effected by the docketing of a judgment pursuant to N.Y.Civ.Prac.Law § 5203 (McKinney 1978) and an execution may thus be issued pursuant to N.Y.Civ.Prac.Law § 5230 (McKinney 1978). Consequently, both a lien and an execution on a leasehold are subject to attack by the trustee under §§ 544(a)(1) and (2) as a judicial lien creditor and unsatisfied execution creditor.

The assumption of these mantles, however, does not enable the trustee, in New York, to employ his status to avoid the Sublease or the Assignment on the ground that they were not recorded.

■ The New York recording act provides:

A conveyance of real property, within the state . . . may be recorded in the office of the clerk of the county where such real property is situated . . . Every such conveyance not so recorded is void as against any person who subsequently purchases or acquires by exchange or contracts to purchase or acquire by exchange, the same real property or any portion thereof, or acquires by assignment the rent to accrue therefrom as provided in section two hundred ninety-four-a of the real property law, in good faith and for a valuable consideration, from the same vendor or assignor, his distributees or devisees, and whose conveyance, contract or assignment is first duly recorded, and is void as against the lien upon the same real property or any portion thereof arising from payments made upon the execution of or pursuant to the terms of a contract with the same vendor, his distributees or devisees, if such contract is made in good faith and is first duly recorded.

N.Y.Real Prop.Law § 291 (McKinney 1978). While a lease for a term exceeding three years constitutes "real property" and conveyance of same is recordable under § 291, N.Y.Real Prop.Law §§ 290.1, 290.3 (McKinney 1978),[3] that section, on its face, provides that an unrecorded conveyance of real property is void only as against bona fide purchasers of real property, and the holder of a recorded lien arising from a purchase mon-

---

**3.** Although under New York case law, a lease, regardless of the length of its term is a chattel real and therefore constitutes personal property, *Mitchell Manor No. 1 Corp. v. Board of Assessors, Nassau County,* 10 A.D.2d 854, 199 N.Y.S.2d 638 (1960); *Deposit Co. v. Syrdelco.,* 249 A.D. 285, 292 N.Y.S. 206 (1936); *People v. McComber,* 7 N.Y.S. 71 (Sup.Ct.1889); for the purposes of N.Y.Real Prop.L. §§ 290 and 291 (McKinney 1979) a lease with a term exceeding three years is considered to be "real property". *See 487 Elmwood Inc. v. Hassett,* 83 App.

Div.2d 409, 445 N.Y.S.2d 336 (1981); *City of Bayonne v. Hocke,* 168 App.Div. 83, 153 N.Y.S. 731 (1915). As stated in an authoritative treatise "[t]he growth of statutory definitions of real property made for the purpose of some particular statute . . . include the interest of the lessee in the term 'real property'." 2 Powell, *The Law of Real Property,* § 221[2] (1982). Since the lease herein is for a term of ten years, it is considered to be real property within § 290.1.

ey mortgage. In New York, judgment lien and execution creditors do not enjoy the protection of the recording statute. *Meadowbrook Farm Apartments v. Carter,* 67 Misc.2d 1093, 326 N.Y.S.2d 281 (1971); *Heiman v. Parnass,* 40 F.2d 558, 559 (E.D.N.Y. 1930); *Savings and Loan Association of Kingston v. Berberich,* 24 A.D.2d 187, 264 N.Y.S.2d 989 (1965); *Saidel v. Brenner,* 44 Misc.2d 60, 252 N.Y.S.2d 867 (1964); *Rich v. McCarthy,* 198 Misc. 347, 98 N.Y.S.2d 638 (1950); *Blum v. Krampner,* 28 N.Y.S.2d 62 (Sup.Ct.1940); *Fox v. Sizeland,* 170 Misc. 390, 9 N.Y.S.2d 350 (1938). *Compare In re May,* 19 B.R. 655 (Bkrtcy.N.D.Fla.1982); *In re Jeff Benny Anderson,* 30 B.R. 995 (Bkrtcy.M.D.Tenn.1983).

▮ Lacking that benefit, the trustee, notwithstanding his position as a judicial lien or execution creditor pursuant to §§ 544(a)(1) and (2), cannot avoid the Assignment or the Sublease on the ground that they were unrecorded. *See* 4B *Collier on Bankruptcy* ¶ 70.55 (14th Ed.1979). The trustee's motion for summary judgment with respect to its claims under §§ 544(a)(1) and (2) must, therefore, be denied.

### B. *Bona Fide Purchaser Status*

The trustee also claims to be entitled to summary judgment pursuant to § 544(a)(3) of the Code on the same grounds of failure to record the sublease and assignment. In its best possible light, the trustee's argument is two pronged: (i) that § 544(a), by its terms, exempts him from any constructive notice that might be applied to defeat the claim of an otherwise bona fide purchaser under § 291 of the New York Real Property Law, and (ii) that if the trustee, as a bona fide purchaser, is subject to constructive notice, he is charged with only the facts revealed by the record. As discussed below, neither prong is tenable.

### 1. "Without Knowledge" under § 544(a)(3).

At first blush, the phrase "without regard to any knowledge" contained in § 544(a) seems hopelessly inconsistent when viewed in the context of the many state recording statutes which limit bona fide purchaser status to one who purchased in good faith, without notice and for valuable consideration. *See Some Considerations to be Observed in the Recording of Leases,* Report of Special Committee on Leases, Real Property Division A.B.A., 12 Real Property, Probate and Trust Journal 256 at 259 *et seq.* (1977) ("Some Considerations"). Further examination, however, reveals the transparent nature of the purported inconsistency between a trustee without knowledge and yet subject to notice.

▮ First, the terms are not equivalent. The term "knowledge" as employed in § 544(a) comports actual notice, not constructive notice. *In re Richardson* 23 B.R. 434, 439 (Bkrtcy.D.Utah 1982); *Some Considerations, supra,* at 267. The choice of that term rather than the broader term "notice" thus indicates that Congress did not intend to shield the trustee under § 544(a)(3) from the effect of constructive notice. *McCannon v. Marston,* 679 F.2d 13, 16–17 (3rd Cir.1982); *In re Fitzpatrick,* 29 B.R. 701, 10 B.C.D. 782, 783 (Bkrtcy.W.D. Wis.1983); *In re Richardson,* 23 B.R. at 439. *Cf. Ernst & Ernst v. Hochfelder,* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 773 (1976); *In re Saypol,* 31 B.R. 796, 10 B.C.D. 1057 (Bkrtcy.S.D.N.Y.1982).

Second, Congress modified the status of bona fide purchasers by inserting the words "against whom applicable law permits such transfers to be perfected." It thereby indicated the continuing validity of state law requirements of constructive notice. *McCannon v. Marston, supra,* 679 F.2d at 17; *Some Considerations, supra,* at 259.

The legislative history supports this analysis. Professor Countryman had criticized those cases holding that a trustee with actual knowledge of unperfected security interests could not avoid those interests despite his status of a hypothetical lien creditor. *McCannon v. Marston, supra,* 679 F.2d at 16; *see* Countryman, *The Use of State Law in Bankruptcy Cases.* 47 N.Y.U.L. Rev. 631, 652–55 (1972). In enacting § 544(a), Congress accepted the criticism and merely sought to make clear that the

trustee's status as a hypothetical lien creditor, execution creditor, or bona fide purchaser of real property should not be affected by the personal knowledge of the trustee or of any creditor. *McCannon v. Marston, supra,* 679 F.2d at 16; *see* Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, Part II, 93rd Cong., 1st Sess. 160–61 and n. 3 (1973).

### 2. Constructive Notice.

■ Pursuant to New York law, notice sufficient to bar a purchaser from avoiding an unrecorded interest as a bona fide purchaser may arise from actual knowledge, *see Herubin v. Malackowski,* 113 Misc. 100, 184 N.Y.S. 829 (1920) or consist of constructive notice of what may be revealed by: (i) an examination of the record, *e.g., Andy Associates v. Bankers Trust Co.,* 49 N.Y.2d 13, 424 N.Y.S.2d 139, 399 N.E.2d 1160 (1979), (ii) reasonable inquiry of those in actual possession, *see Wardell v. Older,* 70 A.D.2d 1008, 418 N.Y.S.2d 196 (1979), or (iii) reasonable inquiry on the basis of all the circumstances. *See In re Hardway,* 31 B.R. 322, 10 B.C.D. 1063, 1068 (Bkrtcy.S.D.N.Y. 1983).

■ In New York, open and visible possession by a third person places a purchaser on constructive notice of the possible existence of prior rights. *See 487 Elmwood, Inc. v. Hassett,* 83 A.D.2d 409, 445 N.Y.S.2d 336 (1981); *Pallone v. New York Telephone Co.,* 34 A.D.2d 1091, 321 N.Y.S.2d 660 (4th Dept. 1970) aff'd 30 N.Y.2d 865, 335 N.Y.S.2d 300, 286 N.E.2d 735 (1972); *Sanzone v. Niagara Mohawk Power Corp.,* 47 Misc.2d 237, 262 N.Y.S.2d 138 (1965) aff'd 27 A.D.2d 646, 277 N.Y.S.2d 125 (1967); *Phelan v. Brady,* 119 N.Y. 587, 23 N.E. 1109 (1890). So strong is the rule that possession by a third party imposes the duty of inquiry on a potential purchaser that many New York leases are unrecorded. *See Friedman on Leases,* § 31.03 at 1145. If no inquiry is made, the purchaser is charged with the knowledge that a reasonable inquiry concerning the defect would have revealed. *See Williamson v. Brown,* 15 N.Y. 354, 362 (1857). At

common law, the presence of a sign has also been held to alert a potential purchaser to the possibility that prior rights might exist in the property. *In re Wonderfair Stores,* 511 F.2d 1206 (9th Cir.1975).

The better reasoned cases apply these concepts in full to § 544(a)(3). *McCannon v. Marston, supra,* 679 F.2d at 15–16; *In re Hardway, supra; In re Fitzpatrick,* 29 B.R. 701, 10 B.C.D. 782 (Bkrtcy.W.D.Wis.1983); *In re Richardson,* 23 B.R. 434, 9 B.C.D. 895 (Bkrtcy.D.Utah 1982); *In re Elin,* 20 B.R. 1012 (D.C.N.J.1982), *aff'd, Appeal of Busche,* 707 F.2d 1400 (3rd Cir.1983); *In re Lewis,* 19 B.R. 548 (Bkrtcy.D.Idaho 1982). *Contra, In re Belize Airways,* 12 B.R. 387, 7 B.C.D. 1044 (Bkrtcy.S.D.Fla.1981); Norton, *Bankruptcy Law and Practice* § 30.05 at 11 (1st Ed.1981) (inquiry limited to record notice). Nothing in the language of the statute or the legislative history indicates anything to the contrary. Furthermore, the protection afforded by the recording statute is a matter of particularly local concern.

To rule otherwise would not only impose a nationwide definition of the term bona fide purchaser, but also could have extreme ramifications. Perhaps nowhere would those ramifications be greater than in the State of New York where most residential and commercial leases are unrecorded, Friedman, *supra,* § 31.05 at 1145, and in New York City where much of the residential housing consists of leaseholds.

If state law notice requirements were not fully applicable to a trustee exercising his § 544(a)(3) powers and a landlord holding many leases were to become bankrupt, tenants would be faced with the threat of eviction by a trustee in bankruptcy merely for lack of recordation. The Code does not contemplate imposing, contrary to state statutes and custom, such uncertainty on the people who rent their office, manufacturing or store space.

*In re May,* 19 B.R. 655 (Bkrtcy.N.D.Fla. 1982); *In re American Mortgage and Financial Company,* 5 B.C.D. 769, 771–72 (Bkrtcy.N.D.Fla.1979) and *In re Jeff Benny Anderson,* 30 B.R. 995 (Bkrtcy.M.D.Tenn. 1983) are not to the contrary. Each of

those cases held that the trustee as a creditor, rather than as a bona fide purchaser, prevailed over an unrecorded or incorrectly recorded conveyance without regard to the trustee's knowledge. Those cases express no intention that the Code should abrogate or limit state law constructive notice concepts. They merely follow the Florida and Tennessee recording statutes. Unlike § 291 of the New York Real Property Law, those statutes protect judgment creditors as well as bona fide purchasers and enable them to take precedence over unrecorded or incorrectly recorded interests in realty.

But where a state statute has been construed to embody constructive notice, that statute controls. *In re Fitzpatrick,* 29 B.R. 701, 10 B.C.D. 782 (Bkrtcy.W.D.Wis.1983); *In re Jones,* 20 B.R. 988 (Bkrtcy.E.D.Penn. 1983); *In re Lewis,* 19 B.R. 548 (Bkrtcy.D. Idaho 1982); *In re Elin, supra.*

In *In re Fitzpatrick,* for example, the debtors, prior to bankruptcy, contracted to sell realty. Neither the contract of sale nor any other indication of the purchaser's interest was recorded at the time of transfer. Initially, the purchaser physically occupied the premises. Subsequently, the premises were occupied by the purchasers' tenants. While the tenants were in possession, the debtors filed a Chapter 7 petition. Ten days later, the purchasers recorded the contract.

In denying the trustee's attempt to avoid the purchasers' interest in the realty pursuant to § 544(a)(3), the court ruled that the Wisconsin doctrine of constructive notice by possession imposed upon the purchasers a duty of reasonable inquiry of the party in possession. 29 B.R. 701, 10 B.C.D. at 784. Such inquiry, the court held, would, as a matter of law, have revealed the tenancy and the interest of the purchasers, thereby precluding a hypothetical bona fide purchaser from avoiding the contract.

■ Here, it is undisputed that the Trimble firm was in possession of at least a portion of the leased premises, and that the name of the firm was on the entrance door. These indicia, as a matter of New York law, give rise to a duty of inquiry. It is at least a genuinely disputed issue whether a reasonable inquiry would have revealed Trimble Coven's status as a sublessor and assignee, thus placing the trustee on notice of the possibility that prior rights existed to the premises. On this record it would appear that the trustee could not accede to the rights of a bona fide purchaser under New York Real Property Law § 291 and thereby avoid the Sublease and Assignment pursuant to § 544(a)(3). Whether additional facts are extant, including evidence that reasonable inquiry would have been futile, is a question that must await trial.

## IV

### SECTION 548

■ Even more strongly do genuine issues of fact permeate the trustee's claim that the Sublease and Assignment violate the fraudulent conveyance tests of § 548(a) of the Code. That section enables the trustee to avoid transfers made within one year of the filing of the petition that were made either with actual intent to defraud creditors or for less "than a reasonably equivalent value" while the debtor was insolvent or became such as a result of the transfer. § 548(a)(2)(A). Although broader in scope, § 548 is particularly designed to prevent a person or an entity which is insolvent or is approaching insolvency from transferring its assets to an individual or entity so that insiders can reach them but outsiders can not. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 989 (2d Cir.1981).

To achieve those purposes, the term "transfers" is employed in § 548(a) in its most embracive sense to include not only transfer of ownership, but also to include a transfer of an interest and even a transfer of possession. 2 *Collier on Bankruptcy,* ¶ 101.41 (15th Ed.1979). Under the Code, as under the Bankruptcy Act,

'[t]ransfer' is defined to be not only the sale of property, but 'every other mode of disposing or parting with property.' All technical and narrowness of meaning is precluded. The word is used in its most comprehensive sense, and is intended to

include every means and manner by which property can pass from the ownership and possession to another, and by which the result forbidden by the statute may be accomplished ...

*Pirie v. Chicago Title and Trust Co.,* 182 U.S. 438, 444, 21 S.Ct. 906, 908, 45 L.Ed. 1171 (1901).

The Assignment of the Lease to Trimble Coven clearly is a transfer of Euro-Swiss' interest in property as defined in § 548(a). So is the Sublease. Although the defendants assert that the Sublease was entered into at the same time as the Lease from the Port Authority, it could not take effect until Euro-Swiss had possessory rights. Being within one year of the date of the filing of the petition, both the Assignment and Sublease fall within the broad ken of § 548(a).

### A. *Section 548(a)(1).*

■■■■ Derived from the statute of Fraudulent Conveyances of 13 Elizabeth, § 548(a)(1) requires proof of actual intent. That is a purely factual issue. *Matter of S & W Exporters,* 16 B.R. 941 (Bkrtcy.S.D.N.Y.1982); *Cooper v. Maurer,* 37 N.Y.S.2d 992 (Sup.Ct.1942). If such intent is shown, the transaction is voidable without regard to whether the debtor received fair consideration for the transfer or was insolvent.

Since a fraudulent transferor will rarely leave direct proof of his actions, circumstantial evidence may afford a basis for a finding of actual intent. 4 *Collier on Bankruptcy* ¶ 548.02[5] (15th Ed.1983). Such evidence may include the absence of fair consideration and the debtor's insolvency. 4 *Collier on Bankruptcy* ¶ 548.02[3]. Indeed, the "badges of fraud" at common law, including lack of fair consideration, *see Scola v. Morgan,* 66 A.D.2d 228, 412 N.Y.S.2d 893 (1st Dept.1979), raise a presumption that the transfer was fraudulent as to creditors. But evidence of intent to defraud may include less conclusive but nevertheless persuasive circumstances. The courts have been willing to infer intent of fraud where the transferee was in a position to dominate or control the debtor's disposition of property. *In re Cushman,* 526 F.2d 23, 31 (1st

Cir.1975). *See also Lytle v. Andrews,* 34 F.2d 252 (8th Cir.1929); *M.V. Moore & Co. v. Gilmore,* 216 F. 99 (4th Cir.1914); *Matter of Rockaway Soda Water Mfg. Co.,* 226 F. 520 (2nd Cir.N.Y.1915); *Duberstein v. Werner,* 256 F.Supp. 515 (E.D.N.Y.1966); *In re Formaggio,* 23 B.R. 688, 7 B.C.D. 948 (Bkrtcy.D.R.I.1982); *cf. Lesser v. Jewel Factors Corp.,* 470 F.2d 108 (2d Cir.1978). These cases show that such transactions are to be examined with great scrutiny.

*Langan v. First Trust and Deposit Co.,* 293 N.Y. 604, 59 N.E.2d 424 (1944) is instructive in that proof that the transferee could dominate or control the transferor was held to create a presumption of intent to defraud. There, the defendant bank, a large creditor of the bankrupt, caused the debtor to discontinue business and then acquired the property through a mortgage at a price far below market value. 293 N.Y. at 608, 59 N.E.2d 424. The court stated that the bank's demand that the debtor shut down his business may be used to infer an intent to hinder unsecured creditors. *Id. See also Duberstein, supra,* 256 F.Supp. at 519; *In re Formaggio, supra,* 23 B.R. 688, 7 B.C.D. 948 (Bkrtcy.D.R.I.1982).

■■■■ In the present case, Mr. Coven was, by his own admission, at least a 33 percent minority shareholder of the debtor. According to the trustee, Coven was a controlling member and President of the debtor, with a 50 percent interest. Varon Affidavit at 4, 27, 41. In addition, Coven was a partner in Trimble Coven, the assignee of the Lease from Euro-Swiss. While there was apparently a close relationship between these two entities, Coven has denied, in a lengthy affidavit, that he had any part in the daily operation of the debtor and that he was in a position to dominate both Euro-Swiss and Trimble Coven.

This genuine dispute regarding the existence of actual intent by the debtor to hinder, delay or defraud its creditors precludes summary judgment. *In re S.W. Exporters, Inc.,* 16 B.R. 941, 944. The general rule in this circuit is that "allegations of fraud do not lend themselves to resolution by way of summary judgment." *Id.* at 947, quoting

*Teledyne Industries v. Eon Corp.,* 373 F.Supp. 191, 195 (D.C.S.D.N.Y.1974); *see United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Friedman v. Meyers, supra,* 482 F.2d 435 (2d Cir.1973). While this Court has no sympathy for the acts for which Mr. Coven was convicted, those acts apparently concerned an attempt to defraud the receiver for customers of the debtor rather than the debtor itself, and, in any event, the trustee makes no claim of collateral estoppel. Even were this Court to follow *Langan, supra,* and apply a presumption of intent, the factual circumstances giving rise to the presumption are sharply disputed and the presumption may be rebutted at trial. Summary judgment is thus inappropriate.

### B. *Section 548(a)(2)(A), (B)(i).*

The trustee's claim that the Sublease and Assignment are voidable under § 548(a)(2) is based on his contention that the debtor received less than reasonably equivalent value since the Lease was later assigned by the trustee for $485,000 and the rent on the Sublease was inadequate. His contention that the debtor was insolvent in May, 1979 and in November, 1979 is based on the debtor's schedules, filed in February, 1980, that showed the debtor to be insolvent.

▮ The first element, contained in § 548(a)(2)(A), is that the transferor must have received a less than reasonably equivalent value in exchange for the transfer. "Value" is defined in § 548(d)(2) as "property, or satisfaction or securing of a present or antecedent debt of the debtor ...". Whether adequate value has been given depends on the circumstances of each case and is "largely a question of fact, as to which considerable latitude must be allowed to the trier of facts." *Klein v. Tabatchnick,* 610 F.2d 1043 (2d Cir.1979); *see also In re Roco,* 21 B.R. 429, 9 B.C.D. 232 (Bkrtcy. 1st Cir.1982). Reasonably equivalent value requires only a "full and adequate" consideration, not a penny-for-penny exchange. *See Rubin v. Manufacturers Hanover Trust Co., supra,* 661 F.2d at 979; *In re Vaniman Intern, Inc.,* 22 B.R. 166 (Bkrtcy.E.D.N.Y. 1982).

▮ In response to the trustee's contention that Euro-Swiss received inadequate consideration for the Sublease and Assignment, the defendants assert that the $485,000 received upon the trustee's assignment of the Lease in 1982 has little relevance. They observe that the best evidence of the market value of the Lease at the time of the Sublease and at the time of the Assignment is the Lease itself. They state that it makes no sense to assume that the Port Authority would lease the premises at less than market value on October 1, 1979, when the Lease commenced. They further note that the Sublease took effect upon the commencement of the Lease and that the Assignment challenged by the trustee occurred less than two months later. On this basis, they claim that since the Trimble firm in receiving the assignment obligated itself to pay the full rent, the assumption of that obligation constituted a giving of reasonable value.

These factual contentions serve to preclude summary judgment with respect to the voidability of the assignment under § 548(a)(2). With respect to the Sublease, it is undisputed that the Trimble firm subleased the more desirable half of the premises at a nominal rent of $100 per month. This does not constitute reasonably equivalent consideration. But since the Sublease becomes significant only if the Assignment were to be avoided at trial, it would serve no purpose to grant summary judgment on this issue at this time.

▮ Factual issues also exist with respect to whether Euro-Swiss was insolvent under § 548(a)(2)(B) when it entered into the Sublease and when it assigned the Lease to the Trimble firm. A balance sheet test applies. 11 U.S.C. § 101(26)(A). Assets are to be valued at market value, not book value. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d at 995; *In re Vaniman Intern, Inc., supra,* 22 B.R. at 185.

That the debtor was insolvent three months after the assignment might, in appropriate circumstances and in conjunction with other proof, create an inference of

insolvency at the time of the assignment. Trial is necessary to determine the propriety of such an inference in view of all relevant facts. Furthermore, the defendants dispute at great length the liabilities of Euro-Swiss, claiming many are fraudulent and subject to counterclaims. Summary judgment is thus inappropriate.

## V

## THE PORT AUTHORITY'S CLAIM FOR POST–PETITION RENT OWED UNDER A LEASE ASSUMED BY THE TRUSTEE

The Port Authority's counterclaim is grounded on the simple proposition that, pursuant to § 365 of the Code, the trustee in assuming the unexpired lease between the Port Authority as landlord and Euro-Swiss as tenant is obligated to cure any default. Section 365(b)(1)(A) expressly so provides and the trustee concedes that rent in the amount of $60,757.34 has not been paid and that the sums due are for post-petition rent.

In view of the clear mandate of § 365(b)(1)(A) and the lack of any dispute regarding the rent owed, the trustee advances several arguments in seeking to preclude summary judgment. First, notwithstanding having invoked the jurisdiction of this Court in bringing this proceeding and notwithstanding his express concession that this Court has jurisdiction to entertain this proceeding, the trustee asserts that this Court lacks jurisdiction to hear the Port Authority's counterclaim. Second, the trustee asserts that the estate, more particularly the $485,000 held by the trustee as proceeds from his assignment and sale of the Lease, is not liable on the counterclaim since the debtor did not occupy the premises during the months for which rent is due. Third, he asserts that if the estate is liable, its liability lies in suretyship and that, therefore, the Port Authority's claim is at best a general unsecured claim. Fourth, the trustee asserts that the Port Authority caused the arrearages to occur. These contentions will be addressed seriatim.

### A. Jurisdiction to Hear a Counterclaim.

Since the trustee concedes the power of this Court to entertain this adversary proceeding, the narrow issue raised is whether the Bankruptcy Court also possesses jurisdiction over a counterclaim asserted by the Port Authority, an adverse party, demanding that the trustee cure post-petition rent arrearages under a lease assumed by the trustee, pursuant to § 365 of the Code. Examination of this question reveals three discrete grounds for the exercise of such jurisdiction.

First, the counterclaim, in asserting a claim against the fund generated upon the trustee's assignment of the lease, asserts a claim against property of the estate. The claim is not a related plenary proceeding under 28 U.S.C. § 1471(b) which the Supreme Court in *Northern Pipeline* held requires the jurisdiction of an Article III Court. *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Rather, the counterclaim, like the trustee's claim, asserts a claim against property within the possession of this Court, thus falling within the traditional summary jurisdiction of the Bankruptcy Court. *Taubel Scott-Kitzmiller Co. v. Fox,* 264 U.S. 426, 432–33, 44 S.Ct. 396, 398–99, 68 L.Ed. 770 (1924); *Herbert v. Crawford,* 228 U.S. 204, 208, 33 S.Ct. 484, 486, 57 L.Ed. 800 (1912); *In re Eastern Freight Ways, Inc.,* 9 B.R. 653, 655 (Bkrtcy.S.D.N.Y.1981); *David M. Hunt Construction Co. v. Olney Federal Savings and Loan Association,* 3 B.R. 92, 94 (Bkrtcy.E.D.Penn.1980). That jurisdiction, based on possession of the property is, moreover, exclusive. *Isaac v. Hobbs Tie & Timber Co.,* 282 U.S. 734, 737, 51 S.Ct. 270, 271, 75 L.Ed. 645 (1931); *Murphy v. John Hofman Co.,* 211 U.S. 562, 569, 29 S.Ct. 154, 53 L.Ed. 327 (1908). Thus, if it is to be assumed that the Bankruptcy Court has jurisdiction under the Code and Emergency Rule I to hear the trustee's claim, the same concepts apply to the counterclaim under the Code.

Second, since this Court concededly has jurisdiction to authorize the trustee to assume the Lease under § 365, this Court has jurisdiction to require the trustee to cure defaults under the Lease, as mandated by § 365 as a condition to assumption.

■ The third basis upon which the Bankruptcy Court may properly exert jurisdiction over the counterclaim lies in the traditional ancillary jurisdiction of all courts. *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974). No independent jurisdictional basis is necessary for the Bankruptcy Court, *Federman v. Empire Fire & Marine Ins. Co.,* 597 F.2d 798, 810 (2d Cir.1979), or any federal court to exert jurisdiction over a compulsory counterclaim. *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1925); *Cf. Baker v. Gold Seal Liquors Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974); *United States v. Heyward-Robinson Co.,* 430 F.2d 1077, 1081 (2d Cir.1970); *United Artists v. Masterpiece Productions, Inc.,* 221 F.2d 213 (2d Cir.1955). This principle has been universally followed by the Second Circuit and adopted uniformly throughout the Federal circuit courts. *E.g., Sue & Sam Manufacturing Co. v. B.L.S. Construction Co.,* 538 F.2d 1048-51 (4th Cir.1976); *Warren G. Kleban Engineering Corp. v. Caldwell,* 490 F.2d 800, 802 (5th Cir.1974). *Pipeliners Local Union No. 798 v. Ellerd,* 503 F.2d 1193, 1198 (10th Cir.1974).

Notwithstanding Judge Friendly's persuasive concurring opinion in *United States v. Heyward Robinson Co.,* 430 F.2d 1077, 1087 (2d Cir.1970) (J. Friendly, concurring), urging the extension of ancillary jurisdiction to embrace permissive counterclaims, *see also* Green, *Federal Jurisdiction Over Counterclaims,* 48 N.W.U.L.Rev. 271 (1953), the federal courts have maintained the dichotomy. *See Warren G. Kleban Engineering Corp. v. Caldwell,* 490 F.2d 800, 802 (5th Cir.1974); *cf. Newburger Loeb & Co. Inc. v. Gross,* 563 F.2d 1057, 1070 (2d Cir.1977). The issue remains open in the Supreme Court. *Baker v. Gold Seal Liquors Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974).

■ The policy of affording ancillary jurisdiction to compulsory counterclaims is to "[p]revent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters;" *Southern Construction Co. v. Pickard,* 371 U.S. 57, 60, 83 S.Ct. 108, 110, 9 L.Ed.2d 31 (1962); *Warren G. Kleban Engineering Corp. v. Caldwell,* 490 F.2d 800, 802 (5th Cir.1974). *See also Moore v. New York Cotton Exchange,* 270 U.S. 593, 607-611, 46 S.Ct. 367, 370-71, 70 L.Ed. 750 (1925). In carrying out that purpose the Second Circuit has adopted the "logical relationship test". *Federman v. Empire Fire and Marine Ins. Co.,* 597 F.2d 798, 811-12 (2d Cir. 1979); *Manway Construction Co. v. Housing Authority,* 711 F.2d 501 (2d Cir.1983). As applied, the test does not require "an absolute identity of factual backgrounds for the two claims, but only a logical relationship between them." *United Artists Corp. v. Masterpiece Productions, Inc.,* 221 F.2d 213, 216 (2d Cir.1955). *See also United States v. Heyward-Robinson Co. Inc.,* 430 F.2d 1077, 1081 (2d Cir.1970). It is, instead, a "flexible approach" attempting "to analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem,* 571 F.2d 119, 123 (2d Cir.1978); *United States v. Heyward-Robinson Co., supra,* 430 F.2d at 1081-82; *Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir.1961).

The Port Authority's counterclaim bears such a logical relationship to the claims asserted by the trustee. The relief sought against the Port Authority is to foreclose, on the basis of the arguments presented by the trustee on this motion, the Port Authority from any claim to the fund generated upon the trustee's assignment of the Lease. By its counterclaim, the Port Authority asserts the claims sought to be foreclosed. Thus, to not entertain the counterclaim would entail separate proceedings of identi-

cal issues. Because collateral estoppel may bar some of the Port Authority's contentions were they asserted later in a separate suit, the counterclaim is also compulsory under the logical relationship test. *See Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir.1961); *cited with approval, Harris v. Steinem,* 571 F.2d 119, 123 (2d Cir.1978).

The provisions of former Rule 713(2) of Bankruptcy Procedure denominating all counterclaims as permissive does not affect this conclusion. That rule modified Federal Rule of Civil Procedure 13(a) in order to relieve an adversary party from having to assert a plenary compulsory counterclaim before a Bankruptcy Court having only summary jurisdiction under the former Bankruptcy Act, and thereby preserving the adversary's ability to bring his case before a plenary court. With the distinction between plenary and summary jurisdiction having been abolished by the Code, Bankruptcy Rule of Procedure 7013 makes Federal Rule of Civil Procedure 13 fully applicable to claims arising after the entry of an order for relief. The Port Authority's claim that the trustee must cure the default is just such a claim. This Court has jurisdiction to entertain it.

■ The trustee's argument that the estate did not occupy the premises during the period while the rent arrearage was accruing and therefore cannot be held liable for the arrearage is inconsistent with the facts and the applicable law. More precisely, the debtor, on December 12, 1980, entered into the Stipulation noted above which affirmed that the debtor occupied the premises after the Assignment of the Lease to Trimble Coven and was jointly liable with that firm for the rent. Having offered no evidence to the contrary, the trustee is bound by the Stipulation as written. *See Applegate v. Top Associates, Inc.,* 425 F.2d 92 at 94 (a mere denial is insufficient to preclude summary judgment).

■ Apparently in an attempt to overcome the Stipulation, the trustee asserts that if the Estate occupied the premises, it should be liable only for reasonable use and occupancy charges reflecting the benefit accruing to the Estate from the use of the premises. The benefit analysis suggested by the trustee and his reliance upon *American Anthracite and Bituminous Coal Co. v. Leonardo Arrivabene S.A.,* 280 F.2d 119 (2d Cir.1960) and *In re Rymes,* 14 B.R. 807 (Bkrtcy.D.Conn.1981) is misguided. That analysis arises only where the lease has been rejected. When a lease is assumed, § 365(b)(1)(A) conditions the assumption on the cure of all defaults, not merely the payment of reasonable use and occupancy charges. *See In the Matter of Shatz Federal Bearing Co.,* 5 B.R. 549, 554 (Bkrtcy.S.D. N.Y.1980). ("Thus had there been court approval of the contract, . . . or express assumption of the contract, . . . the issue as to benefits received by the debtor would not have been significant."); 2 *Collier on Bankruptcy* ¶ 365.03 (15th Ed.1979). It was the rule under the Act, and remains so under the Code, that upon assumption of a lease the landlord is entitled to payment of the fixed rents without interruption.

If the lease is eventually adopted the trustee or debtor in possession will then be under obligation to pay the amount of rent reserved for the period extending from the filing date to the time of assumption, and thereafter, and if payments for use and occupation during the period previous to assumption have been in a lesser amount than specified in the lease, the balance must be made up.

2 *Collier on Bankruptcy* ¶ 365.03 *Accord In re Chase Commisary,* 11 F.Supp. 288, 289 (S.D.N.Y.1935); *In the Matter of Allied Technology,* 25 B.R. 484, 500 (Bkrtcy.S.D. Ohio 1982); *In re Standard Furniture Co.,* 3 B.R. 527, 530 (Bkrtcy.S.D.Cal.1980).

■ The trustee's third argument is that the debtor stood merely in the position of a surety, asserting that the rent arrearage was not the debtor's responsibility. This argument is contrary to the Stipulation and the applicable law.

The Stipulation plainly states that "the debtor and the assignee shall both be liable to the landlord" under the assignment.

This provision is dispositive since no evidence to the contrary was presented.

■ Exclusive of the Stipulation, the trustee's argument, is erroneous as a matter of law. *Allied Technology, Inc.,* 25 B.R. 484 (Bkrtcy.S.D.Ohio, W.D.1982). In *Allied,* the debtor-lessee assigned its complete interest in a lease to a third party with the consent of the landlord. The court held that the debtor, nevertheless, remained in privity of contract with the lessor and thus was jointly liable for payment of rent. *Accord South Bay Center, Inc. v. Butler, Herrick & Marshall,* 43 Misc.2d 269, 271, 250 N.Y.S.2d 863 (1964) (assignor jointly liable for rents under a lease unless the assignor was specifically granted a release from such liability by the landlord); *Halbe v. Adams,* 176 A.D. 588, 590, 163 N.Y.S. 895, 896 (1st Dept. 1917); *Howard Stores v. Robison Rayon,* 64 Misc.2d 913, 915, 315 N.Y.S.2d 720, 722 (App.Term 1970). No such novation has been presented to this Court. Consequently, the trustee is not a surety on the Lease, but rather stands jointly and severally liable with Trimble Coven for the rent.

The fourth argument urged by the Trustee is based upon the rationale expressed in *In the Matter of Trim-X, Inc.* 695 F.2d 296 (7th Cir.1982). The *Trim-X* court held that under § 504(c) the necessary costs of preserving property of a secured creditor, where the creditor caused or consented to such expenses, could be charged to the creditor for the period prior to the trustee's first opportunity to abandon the property. *Trim-X,* 695 F.2d at 300–01. The trustee's assertion that *Trim-X* is applicable in a case where the lessor fails to evict an assignee is not persuasive.

■ First, as the exception to the general rule, the principle articulated in *Trim-X* is limited to expenses incurred primarily for the benefit of the secured creditor's interest in the collateral or property. The payment of the post-petition rents cannot be classified as an expense benefiting the landlord's interest in the premises. The value of the interest remains the same.

Second, the *Trim-X* rationale applies to pieces of property which are abandoned by the trustee. In the present case, the Lease was assumed; therefore, any expenses for the benefit of the leasehold would be for the benefit of the debtor rather than the creditor-landlord.

Moreover, the Port Authority did not cause the expenses by delaying the proceedings. *Trim-X,* 695 F.2d at 301. The Port Authority, in fact, consented to the trustee's assumption of the lease and agreed to proceed against the $485,000 cash fund. These concessions have demonstrated the Port Authority's willingness to reduce expenses of the Estate and to be flexible in permitting a speedy resolution of the proceeding.

The *Trim-X* court explained that the exception in § 506(c) "was not intended to substitute for the recovery of administrative expenses that are properly the responsibility of the debtor's estate." *Trim-X,* 695 F.2d at 301 quoting *In re Codesco Inc.,* 18 B.R. 225, 230 (Bkrtcy.S.D.N.Y.1982). Nor may the exception substitute for the cure required by § 365 of the Code.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule of Bankruptcy Procedure 7052. The Trustee's motion for summary judgment is denied. The Port Authority's motion for summary judgment is granted and the judgment shall be entered directing the trustee to remit to The Port Authority the sum of $60,757.34 as rent arrearage, plus interest from the date of the assignment approved by this Court. *See Mallis v. Bankers Trust Co.,* 717 F.2d 683 (2d Cir. 1983). The trustee may amend his complaint to claim over against others who may have occupied the premises.

IT IS SO ORDERED.